COMMONWEALTH *vs.* JOHN W. BEAL & others
(and a companion case [1]).

Middlesex.    May 13, 1943. — June 28, 1943.

Present: FIELD, C.J., DONAHUE, QUA, DOLAN, & COX, JJ.

*Conspiracy. Bribery. Evidence,* Relevancy and materiality, Of conspiracy, Of reputation, Contradiction of witness. *Witness,* Contradiction, Cross-examination. *Practice, Criminal,* Exceptions: whether exception saved; Discretionary control of evidence; Charge to jury; Requests, rulings and instructions.

Evidence at the trial of three defendants for conspiracy to bribe the mayor of a city in violation of G. L. (Ter. Ed.) c. 268, § 7, warranted a finding of guilt on the part of all the defendants, one of whom, a partner in a firm of architects, made the payments called for by an arrangement previously effected between him and the mayor whereby the mayor was to approve a contract between the city and the firm for architectural work and the mayor and his intermediary were to be "taken care of" by payments from sums received by the firm from the city under the contract; another of whom, the other partner in the firm, knew of and acquiesced in the arrangement and the payments, some of which were made through his personal account with the firm; and the third of whom, a contractor, originally introduced the first partner to the mayor's intermediary as one desiring to obtain the architectural work and willing to make such arrangement, and subsequently participated in some of the firm's payments.

A finding of guilt of violation of G. L. (Ter. Ed.) c. 268, § 7, by giving a gratuity to the mayor of a city "as a consideration for . . . service" by him in connection with an official matter was warranted by evidence that the defendant made an arrangement with the mayor by which the mayor was to approve a contract between the city and the defendant's architectural firm and was to be "taken care of" by payments from sums received by the firm from the city under the contract, and, after the mayor's approval of the contract, made such payments in accordance with the arrangement; and each successive payment constituted a separate act of bribery.

---

[1] The companion case was an indictment against John W. Beal alone.

At the trial of an indictment for conspiracy, certain evidence of relations between the defendants before the date when the conspiracy was alleged to have begun was admissible as background.

A witness might be contradicted by the introduction of testimony voluntarily given by him at a previous trial, although such testimony had been struck out at the previous trial.

No exception to the admission of testimony was seasonably saved where, after the question had been put and the answer thereto had been made without objection, a request to strike them out was made and denied, whereupon counsel then asked that an exception to the question and answer be noted.

There was no error in the admission of testimony which would be relevant if it had a meaning which the jury might find it had.

The extent to which the credibility of a witness may be tested on cross-examination is largely in the discretion of the trial judge.

Evidence as to the reputation for "truth and veracity" of the defendant as a witness at a trial for bribery and conspiracy to bribe did not require the judge to instruct the jury, as requested by the defendant, that, in determining his guilt or innocence, they might consider his general reputation in his community for "honesty and integrity."

It was within the discretion of the judge at a criminal trial not to instruct the jury, as requested by the defendant, that in determining the weight of a certain witness's testimony, they might consider any bias he had against the defendant.

The judge at a criminal trial was not required to give an instruction, requested by the defendant, that testimony of an alleged accomplice should be scrutinized with great caution.

No error appeared at a criminal trial for bribery and conspiracy to bribe in the refusal of certain requests for instructions by the defendants which were adequately covered by the charge.

Two INDICTMENTS, found and returned on March 5, 1942.

The cases were tried before *Brogna*, J.

*A. F. Bickford*, (*Joseph P. Sullivan* with him,) for the defendants Beal.

*J. P. Brennan*, for the defendant Spinelli.

*R. F. Bradford*, District Attorney, for the Commonwealth.

Cox, J.    John W. Beal, hereinafter referred to as Beal, and his brother, Horatio W. Beal, hereinafter referred to as Beal's brother, who were equal partners in an architectural firm, together with Anthony F. Spinelli, were found guilty on an indictment which charged that between January 1, 1938, and September 1, 1940, they conspired "to corruptly give, offer and promise" to one Lyons, the mayor of the city of Cambridge, after his election, a gift and

gratuity with intent to influence his act, vote and opinion, decision and judgment upon matters, questions, causes and proceedings that were then pending and might by law be brought before him in his official capacity as mayor, and as a consideration for any speech, work and service in connection therewith. See G. L. (Ter. Ed.) c. 268, § 7. The Commonwealth's bill of particulars sets out that it was intended by the defendants to influence the approval by the mayor of contracts between the city and the Beal firm to perform architectural services in connection with an addition to the Cambridge Tuberculosis Hospital. Beal was also found guilty on ten counts of an indictment each of which charged that he corruptly gave, offered and promised to said Lyons, after his election as mayor, a gift and gratuity with intent to influence his act, vote and opinion, decision and judgment, which, as stated in the Commonwealth's bill of particulars, related to his approval of contracts to perform said architectural services. See G. L. (Ter. Ed.) c. 268, § 7. The cases were tried together. The motions of the defendants for directed verdicts in each case were denied subject to their exceptions. Each defendant also saved exceptions on questions of evidence and to the refusal of the trial judge to give certain instructions to the jury.

Lyons was elected mayor in November, 1937, and in November, 1939, and no question was raised as to his being mayor during the years 1938 to 1940, inclusive, or that during this period of time all municipal contracts involving $500 or more required his approval. Lyons, as mayor, approved a written contract dated June 15, 1938, between the city and the Beal firm, relative to the making of plans for and supervising the construction of an addition to the tuberculosis hospital, and no question is raised that this contract involved more than $500. He also approved amendments to this contract by agreements dated November 25, 1938, August 23, 1939, and November 1, 1939.

The jury could have found the following facts. One Mannos, who was one of Lyons' "campaign managers" in 1937 and 1939 and knew him "very intimately," had known the defendant Spinelli since 1929. Prior to January, 1938,

he procured $2,000 from Spinelli as a contribution to the
mayor's campaign for election, and also a contribution of
$75 to the cost of a banquet that was given to the mayor
after his election in 1937. After January 1, 1938, Spinelli
saw Mannos and told him that he was interested in the work
at the tuberculosis hospital and reminded him that bids had
been out for this work before Lyons became mayor and that
they were being held up, and suggested that it would be a
good idea for the mayor to change architects "as long as
he wasn't going to allow that to go through." He told
Mannos that he had a good friend by the name of John
Beal, for whom he was working on a high school at the time,
and said: "I think it would be worth your while if you
talked to the Mayor and got him to change architects."
Spinelli wanted him to meet Beal and Mannos said "he
would speak to the Mayor first and see what he was going
to do about it." Following this conversation, he told the
mayor that he had been talking with Spinelli and that if
there was to be a change of architects Spinelli had someone
in mind. About the middle of January, 1938, by Spinelli's
arrangement, he and Beal went to Cambridge and talked
with Mannos. Spinelli introduced Beal saying, "he under-
stands what to do and he is willing to go along and take
care of the boys if you will give him the job [tuberculosis
hospital]." Beal said that he would like to get the work
and "would be willing to take care of the Mayor and . . .
[Mannos] if he could get . . . [it]; that he would be glad
to give the customary one-third if he received the job."
Mannos said he would have to talk with the mayor first.
They then went into Boston and after Beal had gone, Spi-
nelli said "this would be a very good idea for you fellows
to get something and if Graham [the architect] has the job
you won't, he . . . [Beal] is a good man and you can —
and in fact if you want me to manage this I will. In fact
I would like to be your manager and I will take care of
everything and see that you get what is coming to you."
Mannos "just let . . . [the proposition] slide." About a
week later, Beal telephoned Mannos, who told him that
he had not spoken to the mayor, but that he would. Dur-

ing this period, Spinelli saw Mannos two or three times a week in a social way, and on one occasion said to him: "Where I have been so good to you fellows I want to be sure that the job is re-advertised and have Mr. Beal get the job," and "Then there will be a good chance for me coming in low so I may get the job." Mannos talked with the mayor, and sometime early in February he told Beal to see the mayor. After Beal had seen the mayor, they had some talk about the selection of an architect and about Beal making a survey of the work that was to be done. Beal made a survey and gave an original and duplicate to Mannos, telling him to give the original to the mayor and to keep the duplicate, which he did. Thereafter Mannos received word to have Beal go over to the mayor's office. Later, Mannos received word with reference to the award-ing of the architectural contract; got in touch with Beal; told him that he had received "the job" and to go over and get the contracts in order, that everything was all right, he had the job.

The amount of the first bill submitted by the Beal firm under the contract was $3,750 and the warrant date for this bill was July 16, 1938. On July 20, 1938, a check for $800, payable to cash, was drawn on the Beal bank account and charged one half to Beal and one half to his brother. Beal telephoned Mannos and told him that he had received payment from the city and would like to see him. They met at a Boston hotel and sat down in a corner of the lobby. Beal took out an envelope with some figures on it, and some money, and handed Mannos some money saying: "There is about 827" or "876 dollars" in the envelope. Mannos said that it was not one third of what Beal had received and Beal said that instead of giving him two per cent of the six per cent, he was only going to give Mannos one and one half per cent. Mannos said that was not the agreement they had made and Beal said that if he, Mannos, could convince the mayor to pay for the clerk of the works, he would be glad to give him the other one half per cent. He told Mannos to "take that amount for a while and they would straighten it out." Later, Beal telephoned Mannos

that he was having a little difficulty about the clerk of the works and asked if he, Mannos, would speak to the mayor and see that it went through. Mannos did speak to the mayor, and "it did go through." Thereafter Beal told him that he would see that he got the amount "he was entitled to." They had a conversation later as to whether some work was original work or an alteration, Beal contending that it was an alteration, and that if it were, he would get ten per cent rather than six per cent, and asked Mannos if he would speak to the mayor about it. Sometime later Beal telephoned Mannos with reference to the bids for the work saying: "You know I want to be in right with you fellows. I don't want to do anything that isn't right." He also said: "It is customary for the architect to recommend the contractor to the City after the bids are submitted, and, as you know, Spinelli is the low bidder. Is it still all right with you fellows for me to recommend him?" Mannos said: "By all means, recommend him."

Sometime in November Beal telephoned Mannos that he had something for him. He came to Mannos's office and handed him an envelope saying: "There is about $2,750 here," that he had got his big payment and was giving Mannos the one third plus a little on what he did not give him on the other payment. The Beal firm, on November 12, received a check from the city for $8,066.40, and on November 14, there was a withdrawal from the firm funds of $1,375 payable to Beal, and on November 15, a withdrawal of $1,375 payable to his brother. Early in 1939, Beal telephoned Mannos that he would like to go over to his office. When he did not arrive, Mannos told his secretary that if Beal came and left anything with her, it would be all right, and the next morning his secretary went to his safe, took out an envelope that contained "around" $1,400 and gave it to him. Beal went to Mannos's office in February, 1939, late in the afternoon, and when he was informed that Mannos had left, he gave the secretary an envelope for her to keep for Mannos saying that the envelope was valuable, to take care of it, to lock it up, and put it away for Mannos. She put it in the safe and gave it to

Mannos the next morning. She testified that she had occasion to meet Beal and saw him perhaps twenty-four times in 1938 and early 1939; that she had telephone calls from him from the early part of January, 1938, until the first of March, 1939; that Beal called on the telephone approximately a dozen times and asked for Mannos. On February 7, 1939, the Beal firm received a payment from the city in the sum of $5,521.31, and on February 16, 1939, $308 was withdrawn from the firm account and charged to Beal and his brother.

After Beal had received payments from the city in March and April, Mannos telephoned him and asked why he had not been over to see him. Beal said he was having a little difficulty but would be over soon. Mannos telephoned again early in May, and Beal saw him about seven o'clock in the evening and gave him an envelope with a little over $200 in it, saying that that was the best he could do, but as soon as "we get some of the larger payments" he would make it up. The Beals received from the city in March and April, payments amounting to $1,244.76. At that time, according to Mannos, Beal was "behind." Mannos had a conversation with Spinelli telling him that his "friend" Beal was delinquent, and Spinelli said: "Well, you know you owe me some money. Why don't you let me get hold of Beal, and I think I can get this money lots easier than you can, because I have occasion to see him once or twice a week on the job and going up to his office on different projects." Mannos testified that he owed Spinelli about $2,500 and he told Spinelli that he would have to see Beal first and see if they could not come to some sort of an arrangement. Beal telephoned him on July 12, 1939, saying that he had something for him and asked him to come to his office. Mannos went and found Spinelli there, who said: "How about that arrangement that I was talking to you about with Mr. Beal?" and "Why can't we start right now?" Beal said: "Do you want to go along on that arrangement that Tony [Spinelli] has been talking about, having me pay him the money for you?" and Mannos said that he did. Beal called his bookkeeper and told her to get an envelope

that she had. She brought it in and Beal handed it to Mannos. On the envelope was marked "$816." Mannos handed "it" to Spinelli and told him to count it, and Spinelli "pocketed the money." Beal then said: "Am I to understand that Mr. Spinelli is to get the future payments?" and Mannos replied: "Yes, until you hear from me." Spinelli said: "Well, when I reach my $2,500 that you owe me I will let you know." When this payment of $816 was received, Beal was still "behind in his account" and this payment brought him up to "the May payment."

Part of all "these various payments . . . [Mannos] had received from . . . Beal from time to time" he took "over to Cambridge and gave . . . to the Mayor." He had "sort of a running account with the Mayor and whenever the Mayor would want any money, he would give it to him on that account; . . . he would usually bring the large payments right over but the smaller ones he would hold on to and accumulate; . . . most of the time he . . . made these payments over at the Mayor's house in Cambridge or at . . . [Mannos's] office in Boston." After the payment in July, he did not keep track of any further payments made by the city to Beal. After that, he asked Spinelli whether he was getting the payments, and Spinelli said that he was not and that he was having difficulty. Mannos asked Spinelli how much he had received, and Spinelli said he did not remember. Mannos told Spinelli that the mayor was "sort of mad that these things weren't coming through;" that when the payments were small, he, Mannos, did not mind, but there were a few large ones and he thought he ought to get some money, and see that he, Mannos, got some.

In September, 1939, Mannos told Spinelli that it was around primary time of the second election of the mayor, and "he had to have some money; that the Mayor was quite disturbed; that there were some large payments coming in to Mr. Beal and he needed the money." Spinelli called Beals' bookkeeper saying that he would have to have some money. She told him to come up in a day or so and on the following day, Mannos and Spinelli went to Devonshire Street, and Mannos waited downstairs, while Spinelli

went up. He came back in about ten minutes and handed Mannos an envelope saying: "There's $500 in there. That is the best I could get." Mannos gave the $500 to the mayor. After September, 1939, Mannos saw Spinelli and told him that the mayor was "raising the devil about the way the payments were coming in and no contributions coming; that he was not going to sign any warrants unless they came through with the money they owed." Mannos testified that the mayor knew about the arrangement with Spinelli. A warrant was held up by the mayor for about a month after this conversation.

Sometime after this, Mannos saw Spinelli about the payments, and was told that no payments had been received from Beal for about a month. Mannos saw the mayor and then went to Beal's office in May, 1940, where he saw Beal's brother and the bookkeeper. He told Beal's brother that he was there at the request of the mayor; that Spinelli was taking him into court for not being paid what he owed him. Beal's brother called the bookkeeper and said: "How much have we given Mr. Spinelli on Mr. Mannos' account?" The bookkeeper said she would look it up, and brought back a slip of paper bearing amounts and dates. Mannos added the amounts and said to Beal's brother: "Why, you people have given him over $3,200." Beal's brother said that these were the amounts that Spinelli had been paid "since he was receiving the money." In November, 1940, Spinelli told Mannos that he had heard that Mannos had "that slip of paper on which the figures had been put" and said: "You are foolish to be holding that thing. There is an investigation on in Cambridge, and if I were you I would tear it up and throw it away." After the conversation in Beal's office, when it was arranged that payments were to go to Spinelli, he tried to reach Beal through his brother, and told his brother to get hold of Beal and see that Spinelli "was straightened out; that he knew that the money went to him and Spinelli knows he got it, and he ought to withdraw the complaint." Beal's brother said he would and he would let Mannos know, but he never did. During the period when the arrangement

between Mannos, Beal and Spinelli was in effect for the payments to go to Spinelli, Mannos "acquainted the Mayor with that arrangement." Sometime in June, 1939, one Haller, after he had seen the mayor, saw Beal and delivered a message to him at the request of the mayor, to the effect that he, Beal, was soliciting additional architectural work from the city, and would not be considered "except and until . . . [he] had completed . . . [his] obligations on . . . [his] previous contract." Beal said: "You tell Mayor Lyons it is a damned lie, that all my obligations have been fulfilled and cared for."

Beal testified that in April, 1939, Spinelli told him that he was in great need of money, and that he thought Beal should pay him a commission for giving him the original information about the building program in Cambridge; that in May, 1939, he told Spinelli that he and his brother had discussed the matter, and that they would pay him between $2,000 or $3,000; that they would make no definite agreement with relation to the amounts or total amount; that it would depend entirely upon conditions and how he progressed with the work. Later, Spinelli and Mannos met Beal at his office, and Spinelli told Mannos that Beal had agreed to help him out of his difficulty, and if everything went well on the job, he might be able to credit Mannos "on their account." Mannos replied: "That's fine." Spinelli was paid $2,875 from May 24, 1939, to and including March 1, 1940. Beal also testified that there were certain withdrawals on the firm's books representing the payments to Spinelli, but that Spinelli's name did not appear, for the reason that they did not want the name of any contractor, who was being paid money, to appear on their books. The first payment of $500 was represented by an entry, "Mr. John W. Beal, $496," and $248 was charged to Beal's personal account, and $248 to his brother's personal account. The next payment to Spinelli of $500 was charged to Beal's account. At or about the times when other payments were made to Spinelli, withdrawals from the firm's accounts were charged to Beal, or to his brother, or to both of them, and when the final payment of $175 was

made a check payable to cash in the sum of $222 was drawn, from the proceeds of which the $175 was paid, one half of which was charged to Beal, and one half to his brother. Beal also testified that one third of the sums received for architectural services and for engineering services amounted to $6,205.61, and that the total cash withdrawals amounted to $6,001.08.

Beal's brother testified that prior to the time the arrangement was made to pay Spinelli, Beal told him that Spinelli had spoken about "being paid money," and that, after Mannos and Spinelli left, Beal told him that he had made the arrangements to make payments and had agreed that "they" would pay the money to Spinelli, and that Spinelli was going to credit certain amounts to Mannos for "some other financial obligations," and that he (Beal's brother) signed some of the checks, the proceeds of which went to Spinelli. He testified further, that, in fixing the amounts of the checks, the bookkeeper would go through the bank account, see how much money was on hand and would figure out what she thought was "due" Spinelli, and that he and she would decide whether they could afford it or not; that Beal told him that their arrangement would be about "one-third of the payments which came from Cambridge"; that the arrangement was perfectly satisfactory to him; that he and Beal agreed upon important decisions jointly; that their withdrawals, made in cash, were talked over between them; and that when Beal told him of the arrangement with Spinelli, he told him that "he would go along with him on it."

Spinelli testified as to his having known Mannos since 1929, and of meeting him in the fall of 1937, and turning over to him checks totalling $2,000. In the spring of 1939, he had a talk with Mannos about money that Mannos owed him. Mannos said that he could not pay and suggested that he, Spinelli, see Beal and put the "bee" on the Beals; that he, Spinelli, should get some credit from the Beals for recommending them; that he, Spinelli, went to Beal and had some talk with him; that on the way to Beal's office one day, Mannos asked him how he was mak-

ing out with the Beals on the collection of money. Spinelli told him that he wasn't getting anywhere with Beal, and Mannos said: "Why don't you put the bee on him good;" that he saw Beal, who after some talk, agreed "to about two or three thousand dollars." Spinelli then brought in Mannos and told him what Beal had said, and thereafter Spinelli was paid by Beal or his firm $2,875, of the payments of which he had no record. He was asked if he remembered being asked before the grand jury whether he got any money from Beal, and whether he answered: "No, I never got any money from Beal," and he testified that, if the testimony appeared in the record, he would say that he did so testify, but that "they were not the correct answers and were not true;" that between the first and second time that he appeared before the grand jury, he asked Beal's brother how much he had collected "because Mannos was after him and he wanted to straighten things out with Mannos," and that Beal's brother told him it came to $2,875.

1. The evidence warranted a finding of guilty as to each defendant on the conspiracy indictment. It is unnecessary to repeat the settled principles by which to determine the elements essential to a conspiracy as a common law crime, see *Commonwealth* v. *Dyer*, 243 Mass. 472, 483–486, or to point out more than that a "conspiracy may be proved by circumstantial evidence, and this is the usual mode of proving it, since it is not often that direct evidence can be had. The acts of different persons who are shown to have known each other, or to have been in communication with each other, directed towards the accomplishment of the same object, especially if by the same means or in the same manner, may be satisfactory proof of a conspiracy." *Attorney General* v. *Tufts*, 239 Mass. 458, 494. It is not essential to a conspiracy that parties meet or that they confer or formulate their plans. Common purpose may be inferred from concerted action converging to a definite end. Participation in the concerted action is necessary and participation by others who may have later joined, while the conspiracy is still pending and in furtherance of its criminal purpose, is sufficient to warrant the conclusion that the

later participants are parties to the conspiracy. *Commonwealth* v. *Corcoran*, 252 Mass. 465, 487, and cases cited. See *Lovejoy* v. *Bailey*, 214 Mass. 134, 153. It is unnecessary to repeat a recital of the permissible findings, already referred to. It is enough to say that upon the evidence the jury was warranted in finding Beal and Spinelli guilty.

There is no direct evidence in the case that Beal's brother was a member of the conspiracy at its inception. He was an equal partner with his brother, and it must be assumed that he shared in whatever benefit accrued to the firm as a result of the contract that it received with the approval of Lyons. It may be conceded that the mere fact that he was a member of the firm, nothing more appearing, would not warrant the inference that he was a conspirator. See *Commonwealth* v. *Anthony*, 306 Mass. 470, 479–481. And it may be assumed that mere knowledge of an unlawful conspiracy is not sufficient to make one a member of it, but that he must actively participate therein and must do something in furtherance of it before he is liable as a member. See *New England Foundation Co.* v. *Reed*, 209 Mass. 556, 562; *Jacobs* v. *Anderson*, 244 Mass. 125, 127; *Zito* v. *United States*, 64 Fed. (2d) 772, 775. Beal's brother testified that he and Beal agreed upon important decisions jointly. A few days after it could have been found that the first payment was received by the firm on account of its contract, a check for $800 payable to cash was drawn on the firm's bank account and charged one half to Beal and one half to his brother. It could have been found that shortly thereafter Beal paid Mannos $827 or $876 and that at that time Mannos stated that this was not one third of what he had received, and that Beal stated that instead of giving Mannos two per cent of the six per cent (to which the firm was entitled under its contract) he was only giving Mannos one and one half per cent. Beal's brother admitted that Beal told him that Spinelli was to be paid about "one-third of the payments which came from Cambridge." He admitted that this arrangement was perfectly satisfactory to him. When Mannos, Spinelli and Beal were discussing the proposed arrangement to pay Spinelli instead of Mannos, Beal

called the firm's bookkeeper and told her to get an envelope that she had. She produced the envelope upon which was marked "$816." When Mannos saw Beal's brother with reference to the payments that had been made to Spinelli, he told him that he was there at the request of the mayor. Beal's brother asked the bookkeeper, "How much have we given Mr. Spinelli on Mr. Mannos' account?" The bookkeeper produced a slip of paper bearing amounts and dates, and when Mannos said that Spinelli had been given over $3,200, Beal's brother said that the amounts were what Spinelli had been paid "since he was receiving the money." Some of the payments to Spinelli were charged to the personal accounts of each of the partners, and the firm books did not show that any payments were made to Spinelli. There was evidence, not hereinbefore referred to, coming from Beal's brother, that he did more of the actual designing and "office work" than outside work. The jury might well infer that payments that were made by the firm to Mannos and Spinelli could not be without the knowledge and acquiescence of Beal's brother. Moreover, the significance of the fact that these payments, or, at least, some of them, were shown to have been charged equally to the members of the firm was for the jury. The fact that Beal's brother asked the bookkeeper how much they had given Spinelli "on Mr. Mannos' account" is not without significance. The fact that Beal's brother told Spinelli that the slip of paper showing the sums that had been paid to Spinelli had been paid to him "since he was receiving the money," and the further fact that he knew of the arrangement to pay Spinelli, warranted the inference that someone had been receiving the money prior to the time when the firm began to pay Spinelli. On all the evidence it could have been inferred that Beal's brother knew that Mannos had been receiving it. It is not necessary that all the conspirators join in every part of the unlawful transaction; the motives by which the several conspirators are actuated may be most diverse. The part each is to play, the reward or satisfaction to be received by each and the knowledge possessed by each of the scope and details of the affair may be widely

at variance.  *Commonwealth* v. *Hunt*, 4 Met. 111, 123.  We are of opinion that the jury were warranted in finding that Beal's brother was a party to the conspiracy.

2.  We are of opinion that there was no error in denying Beal's motion for a directed verdict on the bribery indictment.  This indictment is drawn under G. L. (Ter. Ed.) c. 268, § 7, and it embodies substantially the material provisions of that section.  This section sets out several acts the commission of which may constitute a crime, and its violation may be proved by showing the commission of any or all the acts.  *Commonwealth* v. *Albert*, 310 Mass. 811, 820.  *Commonwealth* v. *Bracy*, 313 Mass. 121, 123.  The indictment, however, was submitted to the jury by the trial judge upon the issue whether Beal gave money to, or on behalf of, Lyons, as a result of, or in carrying out, an unlawful or corrupt arrangement.  This amounted to a withdrawal of so much of the indictment as alleged an offer or promise to give.  *Commonwealth* v. *Barker*, 311 Mass. 82, 90.  *Commonwealth* v. *Bracy*, 313 Mass. 121, 123, 124.

The dates on which it is alleged in the several counts of the indictment that Beal gave money are all subsequent to the date when the contract was approved by Lyons.  If nothing more appeared than that money was paid after the contract had been awarded, the conduct involved in the payment is not denounced by the statute, see *Commonwealth* v. *Albert*, 307 Mass. 239, 244; *Commonwealth* v. *Mannos*, 311 Mass. 94, 112; but something more does appear.  It could have been found that the payments were made in furtherance of a corrupt purpose to obtain the contract, that is, that they were made in accordance with prior understandings or arrangements that official action would be taken by Lyons.  The very terms of the corrupt arrangement involved, and, in fact, required that payments should be made as a result of payments to the Beal firm upon its contract.  In *United States* v. *Kissel*, 218 U. S. 601, the defendants were indicted for conspiracy.  They contended that a conspiracy is a completed crime as soon as formed.  At page 607, Mr. Justice Holmes said: "The argument, so far as the premises are true, does not suffice

to prove that a conspiracy, although it exists as soon as the agreement is made, may not continue beyond the moment of making it. It is true that the unlawful agreement satisfies the definition of the crime, but it does not exhaust it. It also is true, of course, that the mere continuance of the result of a crime does not continue the crime. *United States v. Irvine*, 98 U. S. 450. But when the plot contemplates bringing to pass a continuous result that will not continue without the continuous coöperation of the conspirators to keep it up, and there is such continuous coöperation, it is a perversion of natural thought and of natural language to call such continuous coöperation a cinematographic series of distinct conspiracies, rather than to call it a single one." Section 7 of said c. 268, as far as material, makes it a criminal offence for one to give a gift or gratuity to a municipal officer "with intent to influence his act, vote or opinion, decision or judgment upon any matter, question, cause or proceeding which may be then pending, or which may by law come or be brought before him in his official capacity, or as a consideration for any speech, work or service in connection therewith." If it be assumed that the first of this quoted part of the statute requires that a gift or gratuity must be made before any act is done, nevertheless there is the further provision contained in the clause last quoted, namely, "or as a consideration for any speech, work or service in connection therewith." The word "therewith" relates to "any matter, question, cause or proceeding which may be then pending, or which may by law come or be brought before him in his official capacity." If the gift is made "as a consideration for any speech, work or service" in this connection, this brings the gift within the prohibition of the statute. The gift contemplated must be to a municipal officer and it is "any speech, work or service" of such officer that is involved. It could have been found that "service" was rendered by the mayor. This is found in his official act in approving the contract. And it could have been found that the several bribes were made as a consideration for this service.

The provisions of § 8 of said c. 268, dealing with the

acceptance of a bribe by an officer, relate among other things to a gift of gratuity "under an agreement or with an understanding" that his "vote, opinion or judgment shall be given in any particular manner, . . . or as a consideration for any speech, work or service in connection therewith." See *Commonwealth* v. *Avery,* 301 Mass. 605, 610; *Commonwealth* v. *Barker,* 311 Mass. 82, 90; *Commonwealth* v. *Hayes,* 311 Mass. 21; *Commonwealth* v. *Mannos,* 311 Mass. 94, 112–113. In the case last cited, it was held that a conviction was warranted under an indictment and bill of particulars charging violation of said § 8 by a mayor of a city and a confederate, where the evidence showed that, before approval by the mayor of contracts for employment by certain persons to do work for the city, corrupt bargains had been made with them whereby, in consideration of such approval, they were to pay to the mayor certain portions of sums later to be received by them under the contracts, and that such sums afterwards were paid. In the case at bar, there is evidence of a corrupt agreement and of payments as a consideration for what Lyons did in connection with a matter that came before him in his official capacity, and we are of opinion that the evidence warranted a finding of a violation of the provisions of said § 7.

Beal contends, however, that, upon the evidence, if there was a bribery, it was a single one for the one contract and that in no event was the jury warranted in finding that there were ten different briberies. It could have been found, as already pointed out, that the corrupt arrangement was to pay "the customary one-third" of the contract price and that the payments were made in accordance with this prior understanding or arrangement. We are of opinion that the successive subsequent payments, made as a result of the corrupt arrangement, are comprehended within the scope of the statute, and that the making of each payment constituted a separate offence of bribery. *Commonwealth* v. *Mannos,* 311 Mass. 94, 111, 113. The contention of Beal, if sound, would seem to lead to the result that in every case where the payment of money is made in separate instalments and in the future, the crime of bribery would

not be completed until all such instalments had been paid. The statute permits no such conclusion.

3. There was no error in admitting the evidence as to Spinelli's relations with Mannos prior to the date when the conspiracy is alleged to have begun. The relation of parties charged with conspiracy is not an immaterial matter, and, unless too remote, acts and transactions prior to the alleged date of the commencement of the conspiracy are relevant. The date when a conspiracy is alleged to have begun is not, in effect, a wall behind which the court and jury may never look for the purpose of discovering facts that have a bearing upon the fact of the conspiracy itself. The Commonwealth had a right to show the whole history of the conspiracy from its commencement to its consummation. Such evidence as was admitted is "like the evidence which always has been held to be competent that one charged with a crime had made preparations for its commission, or had by word or deed manifested an intention to commit that crime." *Commonwealth* v. *Stuart*, 207 Mass. 563, 570, 571, and cases cited. *Commonwealth* v. *Meserve*, 154 Mass. 64, 69. *Commonwealth* v. *Riches*, 219 Mass. 440, 442, and cases cited. *Commonwealth* v. *Benesch*, 290 Mass. 125, 133. *Commonwealth* v. *Cheng*, 310 Mass. 293, 295. *United States* v. *Greene*, 146 Fed. 803, 826–827. Moreover, the trial judge told the jury that this evidence was to be used not as itself evidence of the conspiracy but simply as background with respect to the association, friendship and knowledge that Mannos and Spinelli had with and of each other.

Beal excepted to the admission of certain testimony that he gave on the occasion of another trial to the effect that he then said, in answer to the question whether he paid Spinelli anything in connection with securing "this job," that he did not. The contention is made that this evidence at the former trial was struck out and that this fact rendered the evidence incompetent at the trial of the case at bar, relying upon *Wakeley* v. *Boston Elevated Railway*, 217 Mass. 488, 491. The case is distinguishable. There the plaintiff had been required to answer certain interrogatories, and it was held that the questions she had been compelled

to answer were not competent, and that it was improper to permit her to be cross-examined respecting answers that she had been compelled to make contrary to law.  It seems that the evidence in the case at bar was offered for the purpose of contradicting Beal, who was a witness.  It does not appear that he was compelled to give the answer in question at the former trial.  It follows that we have a voluntary statement of Beal offered for the purpose of contradicting him.  We think the evidence was admissible.  *Langan* v. *Pianowski*, 307 Mass. 149, 151, 152.  *Commonwealth* v. *Galvin*, 310 Mass. 733, 748, 749.  There is authority for the proposition that where testimony at a former trial has been struck from the record, this does not make the testimony · incompetent at a later trial as a contradictory statement of the witness.  *People* v. *Turner*, 265 Ill. 594, 602.  If, as Beal contends, the testimony at the former trial was not inconsistent with anything that he said at the trial of the case at bar, it cannot be said that its admission amounted to reversible error.

Spinelli asked the trial judge to strike out testimony of Beal to the effect that Spinelli was a nuisance, and that he paid him "to avert the nuisance."  Beal had already testified without objection that Spinelli had been very much of a nuisance and that he did not think that Spinelli had done anything in getting the contract; and then two questions involving the payment "to avert the nuisance" were put and answered without objection.  It was then that Spinelli's counsel asked that the last two questions and answers be struck out.  This request was denied.  Counsel then asked that his exception be saved to the questions and answers; whereupon the trial judge stated that it was rather late to object.  We think that the request to strike out came too late, see *Commonwealth* v. *Valentino*, 257 Mass. 419, 420, where it was said that "Nothing appears to show that counsel for the defendant was surprised by the answers, or misled by the questions."  And we also think that no exception was seasonably saved.

Spinelli excepted to the testimony of the witness Haller, hereinbefore referred to, relative to the message that he

said came from Lyons. No objection was made to Haller's testimony that he delivered a message to Beal at Lyons's request. Spinelli contends that the testimony of Haller related solely to the request that Beal live up to his "contractual" obligations with the city. It could have been found that the conspiracy was still operating at the time Haller delivered this message to Beal, and upon all the evidence it was for the jury to determine the significance of the language used by the witness. *Commonwealth* v. *Hurley*, 311 Mass. 78, 80, 82.

Spinelli also excepted to the exclusion of the following question propounded to Mannos: "In outlining your case to your own attorney, so that he could make an opening you lied to him about the facts of your . . ." Mannos had already testified that what he said in the trial of his own case was not true, and that he had told a lie and more than one. The question, if it may be called such, was properly excluded. In the first place, the record discloses that it was not completed, and in the second place, it was open to Spinelli, if he saw fit and could, to show that Mannos had made inconsistent statements to his attorney. The question then would be whether the statements were made, and it would be for the jury to determine, in weighing them with the witness's testimony, whether they were true or not. *Collins* v. *Stephenson*, 8 Gray, 438, 440. *Burlen* v. *Shannon*, 115 Mass. 438, 446, 447. Finally, it is settled that how far the cross-examination of a witness may be deemed helpful and relevant to the issues being tried, as well as to what extent the accuracy, veracity or credibility of the witness may be tested, must be left largely to the sound discretion of the trial judge, and is not open to revision, unless it is shown that such discretion has been exercised in a way that results in the prejudice of a party to the cause by reason of either too narrow restriction or too great breadth of inquiry. *Jennings* v. *Rooney*, 183 Mass. 577, 579, and cases cited. *Gerber* v. *New York Central Railroad*, 288 Mass. 318, 321. We are of opinion that no abuse of discretion is shown.

4. The action of the trial judge in denying several requests for instructions to the jury remains to be considered.

Beal requested that the jury be told that they were entitled to take into consideration, in determining his guilt or innocence, his general reputation in his community for "honesty and integrity" together with the other evidence in the case. Several witnesses testified as to Beal's reputation for "truth and veracity." Evidence of a witness's reputation for truth and veracity bears upon his credibility as a witness. *Eastman* v. *Boston Elevated Railway*, 200 Mass. 412, 413. See *Commonwealth* v. *Maddocks*, 207 Mass. 152, 157–158. Ordinarily, the defendant in a criminal case may put in evidence his general good reputation in regard to the elements of character involved in the commission of the crime charged against him, for the purpose of establishing the improbability of his having done the wrong imputed to him, upon the theory that a man of good character is unlikely to be guilty of a crime involving moral turpitude, and reputation is an index of character. *Commonwealth* v. *Nagle*, 157 Mass. 554. If such evidence of reputation is admitted, its weight should be left to be determined by the jury in connection with all the other evidence in the case. *Commonwealth* v. *Leonard*, 140 Mass. 473, 480. See *Colburn* v. *Marble*, 196 Mass. 376, 379–380. The evidence upon which the requested instruction was based did not require it to be given. That evidence did not go to establish Beal's reputation in regard to the elements of character involved in the commission of the alleged offence. It related only to his character as a witness.

Beal and his brother requested an instruction to the effect that any bias a witness might be found to possess against them might be considered by the jury in determining what weight should be given to the testimony of such witness. These defendants have directed their argument in connection with this request to the testimony of the witness Haller. We are of opinion that the trial judge was not required to give this request. Haller's evidence discloses merely that he delivered a message to Beal at Lyons's request. It is true that Beal testified that when he became commissioner of public works, he cancelled certain contracts between the department and Haller's firm and that Haller

claimed that there was a substantial sum of money due; that following these cancellations, he had several conversations with Haller in the course of one of which Haller told him that he had found Lyons a very satisfactory man with whom to do business, and that he felt that Beal should see Lyons because he felt that, if he did, Beal might stand a good chance to get a housing job; that when Beal made no reply, Haller said: "The Mayor is sore at you, you have not met your contract obligations with him"; to which Beal replied that he had met every obligation he had under any contract. It is doubtful whether the jury would be warranted in finding that Haller was biased against the Beals. For all that appears, he was acting as a messenger for Lyons. It does not appear that he ever objected to the cancellation of any of his firm's contracts or that there was not a substantial sum of money due from the department. In fact, it would seem from Beal's version of what Haller said that the latter was attempting to help him to secure additional contracts. If it be assumed, however, that, by some possibility, the jury could take a different view of this evidence, we think the point comes within what was said in *Commonwealth* v. *Polian*, 288 Mass. 494, 499, and cases cited: "Charges would be endless as well as confusing if a judge could be compelled to call attention to every subsidiary fact and every possible inference. . . . It is for the judge to decide to what extent he will state the evidence and discuss the possible inferences of fact that may be drawn from it."

Both Beal and his brother requested instructions as to the sufficiency of circumstantial evidence to warrant conviction. The judge was not required to adopt the precise phraseology of the request. His complete charge to the jury appears in the record and, from an examination of it, we are of opinion that the request was sufficiently covered. See *Commonwealth* v. *Mannos*, 311 Mass. 94, 113, 114, and cases cited.

Both Beal and his brother requested instructions defining an accomplice and to the effect that the testimony of an accomplice is to be received with the greatest caution and

distrust, and with great caution unless it is corroborated by independent evidence. They concede that the judge "was not required to instruct the jury that the testimony had to be corroborated in order to secure a conviction," but that, nevertheless, instructions should have been given that such testimony should be scrutinized and received with great caution. Despite the fact that it may be the general practice to caution a jury not to convict where the evidence consists of the uncorroborated testimony of an accomplice, *Commonwealth* v. *Leger,* 264 Mass. 217, 220, there is no rule of law requiring the judge to instruct a jury as to the weight to be given to the testimony of an accomplice. *Commonwealth* v. *Phelps,* 192 Mass. 591, 595, and cases cited. *Commonwealth* v. *Leventhal,* 236 Mass. 516, 521. The reason for this rule well may be that the jury in the exercise of common sense and experience do not need to be told much about this matter.

All of the defendants requested an instruction to the effect that a payment of a gratuity to a public officer after the performance of an official act in accordance with his judgment and discretion, and in the absence of any promise or agreement to pay him for such performance, would not furnish any ground for the prosecution of the person giving that gratuity. This instruction is in part a quotation from what was said in *Commonwealth* v. *Mannos,* 311 Mass. 94, 112. The judge read to the jury the material parts of § 7 of said c. 268. He stated that the indictment charged that the defendants conspired to do something that the statute, which he had just read, says is a crime, and that, if the Commonwealth had satisfied the jury beyond a reasonable doubt that the defendants, any two of them, or all of them, entered into a conspiracy "to corruptly give, offer or promise any gratuity or gift or payment" to Lyons "to influence his act . . . decision or judgment, then that is a criminal conspiracy." As already pointed out, he told the jury, in effect, that the Commonwealth had the burden of satisfying them beyond a reasonable doubt that actual payments were made to or on behalf of Lyons, as a result of or in the carrying out of an unlawful or corrupt arrangement, and that, if

they were not so satisfied, it was their duty to return a verdict of not guilty. He stated the contention of the defendants to the effect that the payments to Spinelli were made not in pursuance of any corrupt understanding, but were mere gratuities given to Spinelli in recognition of the good offices of Spinelli to the Beal firm in obtaining the contract, and that if the payments were made as the defendants contended, then they were not bribes, for the reason that, if they were so made, this was not as a result of any promise to Lyons or in connection with or as a result of influencing him in his act, decision or judgment with respect to granting the particular contract. We are of opinion that the request was adequately covered. See *Commonwealth* v. *Mannos*, 311 Mass. 94, 112, 113.

Spinelli requested an instruction relative to the payments by the Beals to Spinelli that were made after the contract had been awarded, to the effect that the Commonwealth must prove the "means" by which such payments were to be offered to Lyons to influence any act of his that was then pending before him or that might "from that time" come before him. The Commonwealth had the burden of proving that an unlawful agreement was made. The significance of the fact that payments were made in pursuance of an unlawful agreement has already been referred to. The import of the request now under consideration is not entirely clear from its language. If it be assumed, however, that it was intended to convey the thought that payments made after the contract was approved were without significance, the judge was not required to give the instruction. What has already been said as to the meaning of § 7 of said c. 268, together with the instructions already referred to that were given, disposes of this point.

We have considered all exceptions that have been argued and are of opinion that there was no reversible error.

*Exceptions overruled.*