COMMONWEALTH *vs.* WADY A. DAVID & others.[1]

Suffolk.   January 7, 1957. — April 9, 1957.

Present: WILKINS, C.J., SPALDING, WILLIAMS, WHITTEMORE, & CUTTER, JJ.

*Conspiracy.   Narcotic Drugs.   Pleading, Criminal,* Indictment.   *Evidence,* Relevancy and materiality, Competency.   *Practice, Criminal,* Trial of indictments together.   *Words,* "Unlawful traffic," "Illegal sale."

There was no error in denial of a motion to quash an indictment charging conspiracy "to engage in unlawful traffic in a certain narcotic drug, to wit: heroin"; the indictment sufficiently alleged a conspiracy to violate G. L. (Ter. Ed.) c. 94, § 212, as amended, and was substantially in the form found in c. 277, § 79.  [691]

At a trial for conspiracy to engage in unlawful traffic in heroin, there was no error on the record in permitting narcotics agents to testify as experts that certain empty capsules involved in the case were "the type . . . found around the possession of those engaged in illegal sale of

---

[1] David Young and Frederick T. Abraham.

narcotics" and that capsules in the form in which they appeared in an exhibit "with the heroin, are purchased by drug addicts, for personal consumption." [691–692]

At the trial together of three indictments against a defendant, one charging conspiracy to engage in unlawful traffic in heroin, another charging unlawful possession of heroin, and the third charging unlawful possession of heroin with intent unlawfully to sell it, a general exception to the admission of evidence offered by the Commonwealth which was competent on the indictments charging unlawful possession and unlawful possession with intent unlawfully to sell and was not limited to particular indictments was overruled following conviction only on the indictment charging conspiracy. [692]

Conviction upon an indictment charging conspiracy to engage in unlawful traffic in heroin was warranted by evidence that the defendant possessed heroin and needed empty capsules in which to put it for sale to the public, that he requested a coconspirator to procure empty capsules from a pharmacist, that by prearrangement with two coconspirators a large number of empty capsules were procured and speedily moved by a devious route to the apartment of the defendant where they were subsequently found by police, that the empty capsules were of a special size adapted to the narcotics trade and of no apparent legitimate use to the defendant, and that the defendant told a false story with respect to his acquisition of the empty capsules. [693]

Conviction upon an indictment charging conspiracy to engage in unlawful traffic in heroin was warranted by evidence justifying an inference that the defendant by prearrangement with coconspirators participated in the procurement and transportation of empty capsules to be filled later with heroin for illegal sale to the public. [694]

Conviction upon an indictment charging conspiracy to engage in unlawful traffic in heroin was not warranted by evidence which was insufficient to prove beyond a reasonable doubt that the defendant, a registered pharmacist owning and operating a drug store, made a sale of a large number of empty capsules in participation in or with actual knowledge of a conspiracy to get the capsules and fill them with heroin for illegal sale to the public. [695–696]

Acquittal of a defendant upon indictments charging unlawful possession of heroin and unlawful possession of heroin with intent unlawfully to sell it did not require his acquittal upon an indictment charging conspiracy to engage in unlawful traffic in heroin which was tried with the other indictments. [696]

INDICTMENT, found and returned on January 18, 1952.

The case was tried in the Superior Court before *Hurley*, J.

*Arthur L. Brown*, (*S. Roy Remar* with him,) for the defendant Abraham.

*Harry P. Haveles*, for the defendant Young.

*Joseph J. Balliro*, for the defendant David.

*Frederick T. Doyle,* Assistant District Attorney, for the Commonwealth.

CUTTER, J.   An indictment, returned January 18, 1952, charged that the defendants and one Foley (for whom no exceptions are pending) on December 1, 1951, "and on divers other days . . . between that day and the day of the presenting of this indictment, did conspire together to engage in unlawful traffic in a certain narcotic drug, to wit: heroin." David was indicted also on charges of illegal possession of heroin and illegal possession with intent unlawfully to sell it. Young and Abraham, together with Foley, were also charged with being accessories to David's alleged possession of heroin with intent to sell it.   The defendants and Foley were tried together in December, 1952.[1]   The jury found the defendants and Foley guilty only on the conspiracy indictment.   Each of the bills of exceptions of the three defendants seeks review of (a) rulings on evidence, (b) the refusal of the trial judge to direct a verdict for the defendant, and (c) the denial of the defendant's motion for a new trial. Certain of the defendants argue other exceptions, discussed later.   There was evidence from which the jury were warranted in finding the facts set out below.

Young since 1935 had been a registered pharmacist.   From 1938 on, he owned and ran a drug store on Washington Street in Boston.   He had known Abraham for at least eight years.   Abraham and his mother, Mrs. Kaplan, lived at 1 Haven Street (about one hundred to two hundred feet from the drug store) where Foley was a roomer.   Foley, sometimes called "Duggy," had been known to Young as a customer, "for about a year from January, 1952."   Although Young claimed not to know Foley by his name or nickname, a narcotics officer had been told by Young on August 9, 1950, where he might find "Duggy."   Foley had been seen going into the drug store ten to fifteen times.   David had lived at 119 Tyler Street between two and three years.   He and Abraham were partners operating a brewery service

[1] The record affords no explanation of the long delay in the prosecution of these bills of exceptions, which were not allowed until February 10, 1956.

company at 106 Tyler Street where they also conducted a social club together.

On the morning of January 8, 1952, Mrs. Young ordered 20,000 gelatin capsules from a wholesale drug firm in Cambridge, for a customer for whom she had ordered 600 the day before. Young that afternoon went to Cambridge and obtained these capsules in four yellow boxes, each labelled "5,000 each empty Gelatin Capsules No. 5 size." He returned to his drug store with them about 3:30 P.M. Foley was present. At Foley's request, the labels on the boxes were removed and Foley then took them to Abraham's house at 1 Haven Street in a manila bag. Shortly thereafter, Abraham drove in an automobile to 1 Haven Street, entered the house, obtained the paper bag containing the capsules and drove with them about 4 P.M. to the corner of Tyler and Oak streets and delivered them at David's apartment at 119 Tyler Street. About 6 P.M. David came out of 119 Tyler Street and was apprehended by narcotics agents and police and was taken to his apartment. The capsules were found there in the manila bag, still in the unopened boxes from which the labels had been removed.

David was taken to police headquarters after his apartment was searched. David's wife promptly called Abraham's mother, who was driven over to see her by Abraham, who learned while driving her back to Haven Street of David's arrest. Abraham returned to his office at 106 Tyler Street from which two narcotics agents took him to police headquarters about 10:15 P.M.

That evening Young and his wife were questioned by narcotics agents and police. Young admitted that he had sold the 20,000 capsules and that this was a large order, for the largest order he had ever had before was 1,000. He claimed to have delivered the capsules to a "tall, dark man, somewhat skinny type" whom he had not seen before or since. He at first said he received "$18 a box and then said it was $50 for the four boxes." He gave somewhat conflicting statements about whether he or the purchaser scraped the

labels off the boxes. Young admitted that the purchaser "asked him to scrape the labels off, he didn't want the people to know where he got them." Young, when asked if he had any idea what the purchaser was going to use the capsules for, replied "He could put perfume in them." Young's wife in her testimony claimed the purchaser "said he was going into the manufacturing business."

David, when interrogated at his apartment, claimed not to have known the man who delivered the empty capsules to him. In answer to a question he said "Somebody left it [the package with the capsules] here and promised to give me $50 the next day."

There was expert testimony by narcotics agents that the empty capsules, although having a legitimate use for various pharmaceuticals, were "the type that are used for containers of heroin" and also that they were "the type that are found around the possession of those active in illegal sale of narcotics"; that in a survey of this item, it was found that about 70% of the druggists questioned did not even stock the size because of its rare use; that "capsules of this type have a list price but it is not a regular item to be sold anywhere." One narcotics agent testified that, although he had seen pharmaceuticals in this type of capsule, when he had seen them there had "always been heroin or narcotics in them." There was testimony, admitted against all the defendants, without objection, that the empty capsules were similar to those filled capsules mentioned below (admitted in evidence only against David), which contained heroin. Over objection there was testimony that this type of filled capsule was purchased by drug addicts for personal consumption at $2 apiece.

The following further evidence was admitted only against David. While the narcotics agents were at David's apartment, a search was made of a shed on the roof of 119 Tyler Street, reached up a common stairway near David's apartment. There, wedged behind a water tank, was a pouch filled with white powder, which, when analyzed, proved to be heroin, 1,421 capsules with heroin in them, a can of milk

sugar and a set of fine photographic weighing scales. Heroin is usually diluted with milk sugar to reduce its strength and thus make a larger quantity for sale.

It is not necessary to summarize other evidence which the jury could have failed to believe.

1. The three defendants filed motions to quash the indictment on the ground that it did not set forth a crime. Abraham took no exception to the denial of his motion. Young and David have not argued their exceptions. There is no merit in the contention, even if the matter can be considered in the absence of an exception by Abraham, as he contends. Compare *Commonwealth* v. *Andler,* 247 Mass. 580; *Commonwealth* v. *Conroy,* 333 Mass. 751, 756–757. The indictment is in substantially the statutory form for this offence found in G. L. (Ter. Ed.) c. 277, § 79. See *Commonwealth* v. *Galvin,* 323 Mass. 205, 210–211. By alleging conspiracy "to engage in unlawful traffic in . . . heroin," it sufficiently charges conspiracy to violate G. L. (Ter. Ed.) c. 94, § 212, as amended by St. 1938, c. 321, § 2, and St. 1951, c. 575, that is, to engage in the sale, delivery and exchange of heroin. See *Commonwealth* v. *Downey,* 288 Mass. 147, 149. Compare *Commonwealth* v. *Chagnon,* 330 Mass. 278, 281–282. The statutory phrase "unlawful traffic" (see *Stewart* v. *Hugh Nawn Contracting Co.* 223 Mass. 525, 527–528; *Commonwealth* v. *Moriarty,* 311 Mass. 116, 121; *Bruno* v. *United States,* 289 Fed. 649, 655 [C. C. A. 1]; *United States* v. *One Reo Truck Automobile,* 9 Fed. [2d] 529, 530 [C. C. A. 2]; *People* v. *Murawski,* 394 Ill. 236, 242; *People* v. *Dunford,* 207 N. Y. 17, 20) appropriately refers to the subject matter of § 212.

2. David and Young contend that it was error to permit a question to a narcotics agent whether the capsules were "the type . . . found around the possession of those engaged in illegal sale of narcotics" on the ground that it was prejudicial and involved conclusions of law. It was competent to show that this type of capsule was commonly used to distribute heroin. The use of the term "illegal sale" was comparable to the use of the words "abortion kit," held

harmless in *Commonwealth* v. *Aronson,* 330 Mass. 453, 461, or to the testimony that certain needles were of a type and kind capable of causing an abortion considered in *Commonwealth* v. *Dawn,* 302 Mass. 255, 259. See also *Commonwealth* v. *Cheng,* 310 Mass. 293, 298, and cases cited.

The trial judge did not err in permitting another narcotics officer to testify that "capsules in the form as appear in exhibit No. 6 with the heroin, are purchased by drug addicts, for personal consumption." The reference to exhibit 6, which included the capsules found in the shed above David's apartment, was unobjectionable as to David against whom exhibit 6 was admitted. Although the judge expressly "limited to David" any description of exhibit 6, Mrs. Young testified without objection that the type of capsule included in exhibit 6 was similar to the capsules sold by Young, which each defendant could have been found to have had in his possession at some time on January 8, 1952, and thus the reference to exhibit 6 was not improper with respect to the other defendants. The evidence was properly admitted to describe a potential unlawful use of empty capsules of this type. The narcotics agents were clearly sufficiently experts in their work to testify on these issues.

3. David contends that the items found in the shed above his apartment were improperly admitted as against him. The evidence tended to show, by the similarity of the filled capsules there found to those purchased from Young, that the empty capsules also might be filled with heroin. This evidence, in any event, was admissible on the indictments of David for unlawful possession and unlawful possession with intent to sell and was admitted over only a general objection without being limited to particular indictments. It was in evidence for the purposes of all the indictments against David. *Commonwealth* v. *Wunsch,* 129 Mass. 477, 479. *Stitt* v. *Tribe,* 270 Mass. 204, 206. *Irving* v. *Goodimate Co.* 320 Mass. 454, 460–461. See *Commonwealth* v. *Connolly,* 308 Mass. 481, 492–493. See also *Commonwealth* v. *Welansky,* 316 Mass. 383, 404.

4. The motion for a directed verdict filed by David was properly denied. The jury were warranted in finding that he was in possession of heroin filled capsules, similar to those which the jury were warranted in believing had come to him indirectly from Young and directly from Abraham. The jury could reasonably infer that David needed empty capsules to fill with heroin; that he directly, or through Abraham, requested Foley to procure them from Young; that the whole transaction with respect to the empty capsules (which moved with speed from the Cambridge wholesaler through Young and others to David) had been prearranged, at least with Foley and Abraham; and that there was effort to make the movement of the capsules difficult to trace. The evidence of concerted action warranted the conclusion that there was a conspiracy. The adaptability of the empty capsules for the narcotics traffic and the absence of any apparent legitimate purpose leading David to acquire 20,000 capsules of this special size were circumstances properly to be considered by the jury (if they did not believe his story that he was merely keeping the capsules for a stranger). The jury could refuse to believe David's story about the stranger, who was to pay him $50 for keeping the empty capsules for him, and they could regard a false story as to the acquisition of the capsules as indicating consciousness of guilt. *Commonwealth* v. *Spezzaro*, 250 Mass. 454, 457. *Commonwealth* v. *McCarthy*, 272 Mass. 107, 110–111. *Commonwealth* v. *Conroy*, 333 Mass. 751, 755. See *Sheehan* ¦v. *Goriansky*, 317 Mass. 10, 16, and cases cited; *Rich* v. *Finley*, 325 Mass. 99, 105.

5. Although, without more appearing, mere proof of partnership with David would not warrant the inference that Abraham and David were coconspirators (see *Commonwealth* v. *Anthony*, 306 Mass. 470, 478–480; *Commonwealth* v. *Beal*, 314 Mass. 210, 222) the jury could give weight to the fact that Abraham was a partner of David in two enterprises, neither of which, so far as the record shows, had any slightest legitimate use for 20,000 gelatin capsules in its ordinary operations. Further evidence of intimacy between

David and the Abraham family could be found in the contact between Mrs. David and Abraham's mother, with whom Mrs. David obviously wished to talk as soon as David had been arrested.

On the evidence the jury were warranted in finding that Abraham took the capsules from 1 Haven Street to David's apartment. The evidence of prearrangement and of concerted action in transporting the capsules was as strong in the case of Abraham as in the case of David. The jury could reasonably have inferred that Abraham, through Foley, brought about, or at least was informed of the facts of, the purchase of the capsules.

The cache of heroin filled capsules was not admitted in evidence against Abraham as proof of an act of a coconspirator pursuant to the conspiracy. This might well have been done in view of the evidence that a conspiracy existed, found in the concerted action by the defendants in relation to the capsules from which (see *Commonwealth* v. *Beal*, 314 Mass. 210, 221) "Common purpose may be inferred." However, (a) the evidence of the narcotics agents as to the limited use of capsules of this size for purposes outside the heroin traffic and their special adaptability for that traffic, (b) the large number of capsules involved (compare the large use of yeast mentioned in *Valli* v. *United States*, 94 Fed. [2d] 687, 693 [C. C. A. 1], appeal dismissed 304 U. S. 586, as warranting the inference it was to be used in manufacturing alcohol), and (c) the absence of any indication whatsoever of intended legal use of the capsules by Abraham's partner, David, were sufficient, taken with all the other circumstances, to permit the jury to infer that there was agreement by Abraham, David and Foley for the procurement of capsules to be filled later with heroin for sale to the public. The jury might reach this conclusion, even though trade in empty capsules was not illegal, in view of the testimony of the capsules' "susceptibility to harmful and illegal use" in the heroin traffic. See *Direct Sales Co.* v. *United States*, 319 U. S. 703, 710; *Ritter* v. *United States*, 230 Fed. (2d) 324, 327–328 (C. A. 10). Compare *United States* v. *Falcone*, 311

U. S. 205. The evidence did not require a directed verdict of not guilty as to Abraham.

6. Although normally a conspiracy must be proved by circumstantial evidence (*Attorney General* v. *Tufts*, 239 Mass. 458, 494[1]), the evidence of prearrangement and concerted action by Young with the other defendants is insufficient to show that he was a conspirator. Young sold an item distributed by drug wholesale houses, and dealt in to some extent by drug stores. The possibility existed that the sale could have been for a normal business purpose. See *Direct Sales Co.* v. *United States*, 319 U. S. 703, 710–712, especially note 8. Compare *Blumenthal* v. *United States*, 332 U. S. 539, 542, 550. No such normal business purpose is indicated in any way in the cases of Abraham and David. Compare *United States* v. *Simon*, 241 Fed. (2d) 308 (C. A. 7). The price which Young received, $50 (or $72, if the price was $18 a box), is not on this record shown to have given him any excessive profit. No other reward or motive to him for the sale is even suggested. The evidence shows no connection on his part with David and nothing indicates that Young here dealt with Abraham directly. Although it is not essential to proof of a conspiracy that it be shown that the parties met (*Commonwealth* v. *Dyer*, 243 Mass. 472, 483, *Commonwealth* v. *Beal*, 314 Mass. 210, 221, see authorities collected in note, 62 Harv. L. Rev. 276, 277–280), the absence of proof of direct contact with David is of some significance. Assuming that a conviction would be warranted by evidence of the sale of the capsules by Young with actual knowledge of the conspiracy (see *Commonwealth* v. *Beal*, 314 Mass. 210, 222), we think that here the jury would not be warranted in finding that such knowledge had been proved beyond a reasonable doubt. It is about as reasonable (see *United States* v. *Falcone*, 311 U. S. 205, 208) to infer (a) that Young's

[1] Some of the difficulties encountered in conspiracy indictments (as compared with those for substantive offences) are indicated in Mr. Justice Jackson's concurring opinion in *Krulewitch* v. *United States*, 336 U. S. 440, 445 et seq., which contains a comprehensive list of references to discussions of criminal conspiracy in legal textbooks and periodicals.

participation was merely unwise and grossly careless selling of a potentially dangerous article without knowledge of the conspiracy, as (b) that he did have such knowledge. See *Commonwealth* v. *Benesch,* 290 Mass. 125, 131; *Commonwealth* v. *Anthony,* 306 Mass. 470, 479–480; *Commonwealth* v. *O'Rourke,* 311 Mass. 213, 220 (case against O'Rourke); *Commonwealth* v. *Shea,* 324 Mass. 710, 713–714; *Commonwealth* v. *Chagnon,* 330 Mass. 278, 282–283. Compare *Commonwealth* v. *Aronson,* 312 Mass. 347, 350–352. A verdict of not guilty should have been directed for Young.

We have considered the various circumstances in evidence against Young which the jury could have found to be seriously suspicious, for example, the large quantity of capsules; the possibility of their unlawful use; the scraping off of the wholesaler's labels, by or at the request of the customer, because "he didn't want the people to know where he got them"; and the answers given by Young to the narcotics agents, when interrogated, which the jury could have regarded as evasive, if not false, and as indicating consciousness of guilt. We do not think that these circumstances collectively, taken in connection with the other evidence, reach the point of providing the proof which would warrant a verdict of guilty.

7. David and Abraham have not argued their exceptions to the denial of a bill of particulars in their cases. These exceptions need not be discussed.

8. There was no error in denying Abraham's and David's motions for a new trial. Abraham failed to argue his exception. In any event these exceptions had no merit. *Commonwealth* v. *Polian,* 288 Mass. 494, 501. *Commonwealth* v. *Delle Chiaie,* 323 Mass. 615, 618–619. David's acquittal on the indictments charging substantive offences did not require his acquittal on the separate conspiracy charge, as to which proof of the substantive offences was admissible, but unnecessary, evidence of overt acts pursuant to and aggravating the crime of conspiracy (which became complete when the agreement constituting the conspiracy came into existence). *Commonwealth* v. *Hunt,* 4 Met. 111,

125, 132. *Commonwealth* v. *Harris*, 232 Mass. 588, 591. *Commonwealth* v. *Shea*, 323 Mass. 406, 411–412.[1]

> *Exceptions of the defendant Young sustained.*
>
> *Exceptions of the defendants Abraham and David overruled.*

---

[1] Compare, however, the Federal express statutory requirement (mentioned in some of the Federal cases cited in this opinion) of proof of an overt act in a prosecution under U. S. C. (1952 ed.) Title 18, § 371, formerly § 37 of the Criminal Code; *Blumenthal* v. *United States*, 332 U. S. 539, 560, note 18.