COMMONWEALTH *vs.* LOUIS M. GRIECO.

Norfolk.    April 11, 1977. — May 24, 1977.

Present: HALE, C.J., GOODMAN, & GRANT, JJ.

*Practice, Criminal,* Continuance, Assistance of counsel. *Evidence,* Relevancy and materiality, Admissions and confessions, Impeachment of witness. *Error,* Whether error harmful.

A judge at a criminal trial neither abused his discretion nor denied the defendant his right to the effective assistance of counsel by refusing to grant the defendant's motion for a continuance. [354-357]

A judge at a criminal trial did not err in allowing the prosecutor to ask a witness questions which were preliminary to questions concerning the identification of the defendant by the witness's mother, who was deceased at the time of trial and whose identification of the defendant was subsequently ruled inadmissible, where there was no evidence introduced that the witness's mother had in fact made an identification. [357]

In view of the clear and overwhelming evidence of a criminal defendant's guilt, the judge's error in allowing the prosecutor to ask the defendant questions referring to his post-arrest silence and his failure to relate parts of his exculpatory story to a police officer was harmless beyond a reasonable doubt. [357-359]

INDICTMENT found and returned in the Superior Court on June 3, 1969.

The case was tried before *McGuire,* J.

*Thomas Hoffman* for the defendant.

*Charles J. Hely,* Assistant District Attorney, for the Commonwealth.

HALE, C.J.   The defendant was convicted after a jury trial pursuant to G. L. c. 278, §§ 33A-33G, on an indictment charging armed assault in a dwelling house (G. L. c. 265, § 18A) and has appealed.[1] He assigns as error (1) the denial of his motion for a continuance, (2) the allowance of certain questions asked by the prosecuting attorney, and (3) the attempt to impeach him as a witness by cross examination concerning his silence after he had been arrested.[2]

There was evidence from which the jury could have found the following. On March 21, 1969, shortly before 7:30 P.M. Herbert McFaul, his mother, and his father, who was blind, were in their home at 85 Edgewater Drive in the Hough's Neck section of Quincy. Herbert left the house around 7:30 to see his employer. Officers Casey and Cooper of the Quincy police department, who were assigned to a vehicle patrol in the Hough's Neck area, passed by 85 Edgewater Drive at approximately 7:30 P.M. At that time Casey observed a white Ford Econoline van in front of the McFaul house.

At approximately 7:40 P.M. a report of a robbery in the McFaul house was broadcast over the police radio. The Mitchells, neighbors of the McFauls, ran immediately to the McFauls' house as a result of being informed of the police radio broadcast by a friend. There Mrs. Mitchell found Mrs. McFaul sitting on a chair in the dining room with her wrists and ankles bound with white adhesive tape (the container was dangling from the tape around her wrists). When the tape was removed Mrs. McFaul told Mrs. Mitchell that some men had broken in and taken her

---

[1] He was found not guilty on an indictment for assault and battery by means of a dangerous weapon. Four indictments charging motor vehicle violations were dismissed upon motion of the Commonwealth. He was also convicted on an indictment charging larceny of a motor vehicle, but that case was placed on file at the request of the Commonwealth and with the consent of the defendant.

[2] Other assignments of error which have not been briefed are deemed to have been waived. Rule 1:13 of the Appeals Court, as amended effective February 27, 1975, 3 Mass. App. Ct. 801.

son's coin collection and that the men had knocked Mr. McFaul down and threatened both McFauls with a gun. Mrs. McFaul further stated that she had seen a white van. Shortly after the Mitchells came in, Officers Casey and Cooper arrived. Casey had noticed that the white van was no longer in front of the McFaul house. When the officers entered, Mrs. McFaul was still seated with her hands bound. Her eyes and cheeks were swollen, and her neck and face were red. Casey, who recognized the odor of tear gas in the room, was told by Mrs. McFaul that she had been sprayed in the face. Sometime after 8:00 P.M. Herbert McFaul returned home after having been alerted about the radio broadcast and found that his room had been ransacked and that his coin collection, a bureau drawer (which contained most of the coins and some postcards) and a red plaid suitcase were missing.

At 7:40 P.M. Officer Tobin of the Quincy police was on patrol on a three-wheeled scooter in the area immediately opposite the police station located at the intersection of Coddington Street and the Southern Artery (that point being some three miles from 85 Edgewater Drive). He heard the broadcast over the police radio. At the same time he observed a white van coming from the direction of Hough's Neck. When the van turned south on the Southern Artery Officer Tobin followed it. Tobin pulled alongside the van and looked directly at the operator, whom he later identified as the defendant. The defendant was wearing dark gloves. When Tobin motioned the defendant to pull over, the van was driven to its left so that the scooter was hooked onto the bumper of the van and nearly tipped over. At this time Tobin noticed a gun in the defendant's right hand. Tobin stopped the scooter at the roadside, and the van sped away.

Officer Kidney in one police vehicle and Officers Brady and Murray in another had also responded to the 7:40 police broadcast and had been behind Tobin during the bumping of the van and the scooter. The three stopped to see if Tobin was all right and then pursued the van. During a pursuit of over three miles Officer Murray, who

was driving one of the cruisers, pulled alongside the van. Officer Brady, seated in the passenger's seat, saw the driver of the van, whom he identified as the defendant, pass a gun to his passenger, who in turn pointed the gun toward the cruiser. The van then increased its speed and pulled ahead. In the vicinity of the intersection of Pond Street and the Southern Artery, Brady saw an object thrown from the window of the right side of the van. At this point Officer Kidney joined in the pursuit and passed Officer Murray's cruiser.

Kidney, who also identified the defendant as the driver of the white van heading south on the Southern Artery, chased the van along the Southern Artery to Quincy Avenue, in the direction of Braintree. The pursuit continued down Quincy Avenue into Braintree and then to Weymouth Landing, where the van was driven into a parking lot behind a store. Kidney did not lose sight of the van at any time during the chase. When the van stopped a person jumped out from the right hand passenger's side and ran over a nearby hill while the defendant came out from the operator's door and ran to the rear of the van. The defendant was immediately seized by Kidney and a couple of other officers. In a few moments Sergeant Laracy of the Quincy police arrived and gave the defendant Miranda warnings. When asked whether he cared to make a statement, the defendant declined. The defendant was then handcuffed and taken to the Quincy police station, where he was booked and searched by Laracy. Laracy found a roll of one inch white tape, which was of the same brand as that used to bind Mrs. McFaul, and one live .38 caliber cartridge in the defendant's right front pocket. Officer Salamone, who assisted Laracy in the search, found a Canadian silver half dollar in the defendant's left front pocket. This half dollar was identified by Herbert McFaul as being part of his coin collection. After the defendant was searched, he was brought to 85 Edgewater Drive and then returned to the Quincy police station.

A search of the van revealed a red plaid suitcase bearing

the name "McFaul," a gray metal box marked "Canadian half dollars, 1940-1962," a bureau drawer which contained a portion of the coin collection, some personal papers and postcards, and a cardboard box. The postcards were addressed to 85 Edgewater Drive.

Later that evening Detective Rowell of the Quincy police department talked with one Powers, the owner of the white van, in the presence of the defendant. After Rowell had finished his conversation with Powers, the defendant said that he did not know Powers and that he (the defendant) was only a hitchhiker. Rowell then asked the defendant a question, but the defendant refused to talk further.

In the morning hours of March 22, 1969, one Baker stopped his car at the intersection of Pond Street and the Southern Artery. He saw a gun near the edge of Pond Street. Baker picked the gun up with a handkerchief, drove to the Quincy police station and gave the gun to a police officer. The gun, a .38 caliber revolver, had five live cartridges in its cylinder. One chamber was empty.

On April 23, 1970, the defendant appeared before the Superior Court in Dedham, and the cases were held for trial. The cases were called for trial on May 6, 1970, but the defendant did not appear. He was defaulted, and a capias was issued for his arrest. The defendant went to Florida. In 1973, when he learned that agents of the FBI were looking for him, he went to Alabama. He was arrested there in January of 1975 and was then returned to Massachusetts.

1. The defendant had filed a motion for disclosure of the names of the Commonwealth's witnesses, and that motion had been allowed five months before the trial. Shortly thereafter a list of witnesses was submitted to the defendant by the Commonwealth. On the Monday morning when trial was to begin the Commonwealth moved to amend its list by filing a supplementary list, adding the names of nine additional witnesses. Counsel for the defendant had been informed by the district attorney's office of four of those names a week earlier. On the Saturday before trial

the prosecuting attorney informed counsel for the defendant that the elder McFaul was a potential witness. McFaul had been mentioned in the police reports filed with the case, but counsel for the defendant was under the impression that McFaul had died.[3] Another potential witness named in the supplementary list was the daughter of the McFauls; she had married since the crime, and her last name was different from that which appeared in the police reports. The remaining three names had not become known to the prosecuting attorney until the Saturday before the trial, and no effort had been made to inform defense counsel of them.

When the supplemental list was presented the defendant asked for time to interview the witnesses on that list. The trial judge then asked the prosecuting attorney when those witnesses would be called; the response was that with the exception of one, no witnesses whose names the defendant had not been previously given would be called sooner than the following day. The defendant then made an oral request for a two-week continuance, which was denied. The defendant then renewed his request that he be given an opportunity to interview the witnesses before they took the stand. The judge stated that he would afford the defendant an opportunity to do so.[4]

"The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process . . .." *Ungar* v. *Sarafite,* 376 U. S. 575, 589 (1964). See *Commonwealth* v. *Dukes,* 3 Mass. App. Ct. 771 (1975); *Commonwealth* v. *Cavanaugh,* 371 Mass. 46, 50-51 (1976); Rule 4 of the

---

[3] That impression was shared by the prosecuting attorney and may explain why McFaul's name was not included in the earlier list. In any event, as Mr. McFaul was blind, he could not identify the defendant.

[4] Two of the four witnesses whose identities were not disclosed until the day of trial were never called by the Commonwealth. A third gave cumulative testimony and was not cross examined by the defendant. The fourth's (Mrs. Mitchell's) testimony has been set out above. None of the testimony concerned facts which were in dispute.

Superior Court (1974). Absent an abuse of that discretion, a denial of a continuance will not be deemed erroneous. *Commonwealth* v. *Klangos,* 326 Mass. 690, 691 (1951). *Commonwealth* v. *Howard,* 4 Mass. App. Ct. 476, 483-484 (1976). "The discretion of the trial judge cannot be exercised in such a way as to impair the constitutional right to have counsel who has had reasonable opportunity to prepare a defense." *Commonwealth* v. *Cavanaugh, supra.* See *Chandler* v. *Fretag,* 348 U. S. 3 (1954). Furthermore, "[A] myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality.... There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate ... [the defendant's right to effective assistance of counsel]. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar* v. *Sarafite, supra.*

"In considering a request for a continuance, a trial judge should balance the movant's need for additional time against the possible inconvenience, increased costs, and prejudice which may be incurred by the opposing party if the motion is granted. He must also give due weight to the interest of the judicial system in avoiding delays which would not measurably contribute to the resolution of a particular controversy." *Commonwealth* v. *Gilchrest,* 364 Mass. 272, 276-277 (1973).

Basically, the defendant maintains that the denial of his motion for a continuance was an abuse of discretion, the net effect of which was to deny him his right to effective assistance of counsel. We have examined the facts of this case in light of the above mentioned considerations. The defendant had answered that he was ready for trial on several occasions prior to the submission of the supplementary witness list. The judge expressly granted the defendant's request for an opportunity to interview each witness before he should testify. We consider that grant a recognition by the judge of the need to balance the maintenance of an orderly flow of the court's business with the

protection of the defendant's need to interrogate the witnesses. Given the circumstances, we conclude that there was no abuse of discretion in the denial of the request for a continuance and that the defendant was not denied his right to the effective assistance of counsel.

2. After a voir dire the judge ruled that evidence of the identification of the defendant by Mrs. McFaul, who had died prior to trial, was inadmissible. The defendant contends that certain questions asked by the prosecuting attorney prior to that voir dire and ruling were such as to permit the jury improperly to infer that the defendant had been identified by Mrs. McFaul at a showup at the McFaul home and at a probable cause hearing. The answers elicited demonstrated that the defendant was brought from the Quincy police station to the McFaul home and that there Mrs. McFaul and the defendant were in the presence of one another. Testimony was also elicited from Mrs. McFaul's son relative to the probable cause hearing at a District Court which he had attended with his mother. The witness testified that he saw the defendant at that time. These questions were preliminary to questions concerning identification by Mrs. McFaul which the prosecuting attorney was seeking to introduce and were relevant for that purpose. However, there was no evidence introduced that Mrs. McFaul had in fact made an identification. The cases cited in the defendant's brief as authority for the claim that the questions were erroneously allowed are inapposite.

3. The defendant testified in his own behalf to the following effect. He and a friend, one Callei, had been driving around Quincy on March 21, 1969. The two men had stopped in two cafés and had some drinks while Callei made a few phone calls. They left the second café after seven o'clock and drove around for approximately a half hour. Callei stopped the car on a main street and walked into a nearby building. The defendant got out of the car and walked down an alley to urinate. At this point a van drove around the corner, and the defendant saw two men get out and run up a hill into the woods. A police cruiser

arrived moments later, and the defendant was arrested and put into the cruiser by Sergeant Laracy. At the police station the defendant told Officer Tobin, in answer to the latter's questions, that he had "seen somebody run out [of the truck]" but that "it was too dark [to] ... tell who they were."

On cross examination the prosecuting attorney was permitted to ask the defendant questions that referred to the defendant's (a) post-arrest silence and (b) his failure to relate to Officer Tobin other parts of his exculpatory story. The defendant's contention is that the allowance of this cross examination was reversible error because it violated his right against self-incrimination. We deal with each matter separately.

a. The defendant was asked twice during the course of cross examination by the assistant district attorney whether he had told Sergeant Laracy that he had been urinating in the parking lot. The defendant's objection to that question was overruled, and an exception was taken. The defendant answered, "He didn't ask me," and "No." The defendant had been given Miranda warnings by Laracy and had told Laracy that he did not wish to make a statement. There is no doubt "that the use for impeachment purposes of [the defendant's] silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment," *Doyle* v. *Ohio*, 426 U. S. 610, 619 (1976); see *United States* v. *Hale*, 422 U. S. 171 (1975), and art. 12 of the Massachusetts Declaration of Rights. *Commonwealth* v. *Sazama*, 339 Mass. 154, 157-158 (1959).

Having concluded that there was error in allowing such questions, we look to whether the error was harmless beyond a reasonable doubt "on our own reading of the record and on what seems to us to have been the probable impact of ... [the answers] on the minds of an average jury." *Harrington* v. *California*, 395 U. S. 250, 254 (1969). See *Commonwealth* v. *Morgan*, 369 Mass. 332, 340-341 (1975). Clearly "the harmless error doctrine is applicable to the kind of constitutional violation at issue in *Doyle*."

*Chapman* v. *United States,* 547 F. 2d 1240, 1248 (5th Cir. 1977). See *Chapman* v. *California,* 386 U. S. 18, 24 (1967); *Meeks* v. *Havener,* 545 F. 2d 9, 10 (6th Cir. 1976).

It is necessary to weigh the alleged harm to the defendant in the admission of the question with the attendant circumstances of the case. See *Commonwealth* v. *Morgan, supra,* at 340. The answers returned were, "He didn't ask me" and "No." The first answer in effect informed the jury that no question had been put to the defendant which called for him to tell Laracy of the incident in the alley and explained why that information had not been given to Laracy. Furthermore, the record here provides clear and overwhelming evidence of guilt. See *Chapman* v. *United States,* 547 F. 2d at 1249-1250; *Boonton* v. *Hanauer,* 541 F. 2d 296, 299-300 (1st Cir. 1976). Compare *Commonwealth* v. *Bennett,* 2 Mass. App. Ct. 575, 582 (1974); *Commonwealth* v. *Morrison,* 1 Mass. App. Ct. 632, 635 (1973). That evidence solidly linked the defendant to the crimes charged. We are of the opinion that the error in allowing the questions and the answers elicited had no effect on the verdict reached by the jury and was harmless beyond a reasonable doubt. See *Chapman* v. *California,* 386 U. S. at 24.

b. The other question was, "And during the entire time you were in the police station, did you at any time tell the police about Mr. Callei or that there was a car there?" The defendant's objection was overruled, and he answered, "No, I didn't tell them anything." Without more, this question was subject to the same constitutional infirmity as the first question just discussed. We conclude beyond a reasonable doubt, as we did in part 3a, that in view of the clear and overwhelming evidence of guilt, the question and answer had no effect on the verdict reached by the jury and that the error, if any, was harmless.

*Judgment on indictment 46711 affirmed.*