COMMONWEALTH vs. ROBERT P. CORRIDORI
(and two companion cases[1]).

Worcester. January 12, 1981. — February 26, 1981.

Present: GRANT, CUTTER, & DREBEN, JJ.

*Conspiracy. Search and Seizure*, Automobile, Threshold police inquiry.
*Evidence*, Admissions and confessions. *Practice, Criminal*, Harmless
error.

At a criminal trial, there was sufficient evidence to warrant a finding
beyond a reasonable doubt that the defendants had conspired to rob a
pharmacy. [470-476]
Police officers who were investigating a report of suspicious activity by
the occupants of an automobile were warranted in the circumstances
in making a threshold inquiry of the occupants, including the shining
of a flashlight into the automobile, and upon discovering in plain view
a box of shotgun shells with four or five shells missing the officers were
justified in conducting a warrantless search of the automobile.
[476-479]
At the trial of defendants charged with conspiracy to rob and illegal pos-
session of a firearm in a motor vehicle, the judge erred in admitting in
evidence testimony that each of the defendants had remained silent
when asked various questions by police officers who had detained
them. [479-481]

INDICTMENTS found and returned in the Superior Court
Department on July 13, 1979.

The cases were tried before *McCooey*, J. a District Court
judge sitting under statutory authority.

*Brownlow M. Speer* for Mario Leuci, Jr.
*Conrad W. Fisher* for Robert P. Corridori.
*Vincent F. Ricciardi*, Assistant District Attorney, for the
Commonwealth.

GRANT, J. Corridori and Leuci have been convicted by a
Superior Court jury on separate indictments alleging that

---

[1] The two companion cases are against Mario Leuci, Jr.

each "did unlawfully conspire together with [the other] to rob Winston's Pharmacy, Inc., a corporation duly established by law, located in West Boylston . . . ." Leuci was also convicted on an indictment alleging that he "did have in his possession or under his control in a motor vehicle, a loaded shotgun or rifle on land not owned or occupied by" him.[2] An appeal has been taken from each conviction.

1. At the close of the Commonwealth's case the defendants moved under Mass.R.Crim.P. 25(a), 378 Mass. 896 (1979), for required findings of not guilty, thus raising the question whether the evidence presented in the course of the Commonwealth's case in chief was sufficient to warrant a rational jury in finding beyond a reasonable doubt that the defendants were guilty of the offences charged. See *Commonwealth* v. *Kelley*, 370 Mass. 147, 149-150 (1976); *Commonwealth* v. *Clark*, 378 Mass. 392, 403-404 (1979); *Commonwealth* v. *Latimore*, 378 Mass. 671, 676 (1979). The trial judge denied both motions, thus giving rise to the principal question which has been argued by both defendants on these appeals. As Leuci's brief on this question makes no reference to the firearm indictment, we confine our consideration to the question of the sufficiency of the evidence to warrant convictions on the conspiracy indictments. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975); *Commonwealth* v. *Amazeen*, 375 Mass. 73, 74 n.1 (1978). As the judge limited the application of some of the Commonwealth's evidence to Leuci, and as none of the limiting rulings was modified or vacated before the Commonwealth rested (see *Commonwealth* v. *Benjamin*, 3 Mass. App. Ct. 604, 613 [1975], and cases cited), our determination of the propriety of the rulings denying the defendants' motions must be based solely on the evidence which was admitted against both defendants. This is so because if one of only two alleged coconspirators must be acquitted,

---

[2] See G. L. c. 131, §§ 63 (as amended by St. 1970, c. 732, § 2) and 90 (2d par., as appearing in St. 1970, c. 102). We shall refer to the indictment for this offence as the "firearm" indictment.

the other must be acquitted as well. See *United States* v. *Fox*, 130 F.2d 56, 57 (3d Cir. 1942); *Lubin* v. *United States*, 313 F.2d 419, 423 (9th Cir. 1963); *Romontio* v. *United States*, 400 F.2d 618, 619 (10th Cir. 1968), cert. dismissed, 402 U.S. 903 (1971); *United States* v. *Shuford*, 454 F.2d 772, 779-780 (4th Cir. 1971); *United States* v. *Williams*, 503 F.2d 50, 54 (6th Cir. 1974); Nolan, Criminal Law § 452 (1976); Perkins, Criminal Law 622 (2d ed. 1969).

The reader is referred to the rough sketch (not drawn to scale)[3] which accompanies this opinion as we proceed to summarize the evidence most favorable to the Commonwealth which was admitted against both defendants before the Commonwealth rested.[4]

At approximately 6:30 P.M. on April 23, 1979, while there was still daylight, Robert Barton, a part-time police officer in West Boylston with approximately eight years' total experience as either a full- or part-time officer, was off duty and working in the front yard of his home at 89 Central Street in West Boylston. As he worked, he noticed a blue Ford parked on the unnamed street running between Prospect and Central Streets and a light colored Oldsmobile parked on Central Street with its nose pointed in the general direction of Barton's home. As Barton watched, the occupants of the Oldsmobile (later identified as Leuci and one Boria[5]) left their car and walked over to join the occupant of the Ford (later identified as Corridori) in front of the latter car. Except for the length of time necessary to permit

---

[3] Three of the Commonwealth's witnesses testified with reference to a diagram on a blackboard which was visible to the jury. At the conclusion of the trial all counsel cooperated in preparing a sketch of what was on the blackboard, and that sketch was sent out with the jury during the course of their deliberations. That sketch has now become unavailable, but trial counsel, acting at our request during the course of the argument, have reconstructed the original sketch for our use in considering the appeals. It is that reconstruction which accompanies this opinion.

[4] The admissibility of some of the evidence will be considered in parts 2 and 3 of this opinion.

[5] Boria was separately indicted for his participation in the events of the evening but was defaulted and of parts unknown at the time of the trial.

Commonwealth *v.* Corridori.

Corridori to walk over and urinate on the grass area be-
tween Prospect and Central Streets, the three men stood in a
circle in front of Corridori's car for from five to seven min-
utes, at a point approximately seventy-five feet from
Barton's front yard. The circumstances warranted an infer-
ence that the three men were conversing with each other.

The three then returned to their respective cars, with
Boria taking the driver's seat of the Oldsmobile and Leuci
taking the passenger side of the front seat. Corridori then
drove his car out of the unnamed street, turned left into
Central Street and pulled up alongside the Boria car, where
he remained for one or two minutes before driving ahead to
park by the stop sign at the near side of the junction of Cen-
tral and Crescent Streets. The place where Corridori
parked was approximately 150 feet distant from the location
of Winston's Pharmacy on Central Street and commanded a
view of all traffic which might approach or leave the phar-
macy. As soon as Corridori moved ahead of the Oldsmo-
bile, Boria drove that car up to the intersection of Central
and Crescent Streets, turned left on Central Street, entered
the parking lot which served the pharmacy and the complex
of other buildings located on the westerly side of Central
Street, circled in the lot, and then backed his car into the
position indicated on the sketch, with the nose of the car
pointed in the direction of Central Street.

The pharmacy, which was approximately 300 feet from
Barton's home, was the only place on Central Street open
for business at that time of the evening, and Barton was sus-
picious of what he had seen. He stepped into his house, tel-
ephoned the police radio dispatcher, and requested that the
two on-duty patrolmen be sent to the pharmacy to check
out the Oldsmobile, in which Leuci and Boria were then
seated. Barton then went out of the back of his house,
walked through a neighbor's back yard, and took up a posi-
tion behind a stockade fence bordering the municipal light
department property, which is located on the corner of
Central and Crescent Streets.

Officer Kierstead was the first to respond to a call from the dispatcher. As his cruiser approached in a westerly direction along Prospect Street, Barton stepped out from behind the fence and pointed in the direction of Boria's car. Kierstead turned left into Central Street and approached the pharmacy. As he did so, Boria's car began to move in the direction of Central Street, but Kierstead blocked its forward progress. Officer Palmer arrived almost simultaneously from a different direction and drove his cruiser up against the front of Boria's car so that it could not move. Both officers got out of their cruisers and approached the car. Kierstead asked Boria and Leuci what they were doing there and was told that they were waiting for a friend from Templeton. Palmer asked the same question and was given the same answer. At Kierstead's request Boria produced his driver's license and the registration for the car, which he owned. Kierstead went to his cruiser to ask the dispatcher for a records check on Boria. Palmer, meanwhile, approached Leuci's side of the car, asked him to get out, and ordered him to turn around facing the side of the car, with his hands on the top of the car. Palmer pat frisked Leuci, found no weapon, and ordered him to remain in position while he took Leuci's driver's license to his (Palmer's) cruiser for the purpose of calling the dispatcher for a records check on Leuci.

Daylight had turned to dusk, and Palmer brought a flashlight with him when he returned from his cruiser. He shined his flashlight on Boria, who was still seated in the driver's seat, and from there across the instrument panel, across the back seat and then down onto the floor of the back seat. On the floor, directly behind Boria, Palmer discovered a cardboard box marked "Remington." Palmer walked around to Boria's side of the car and asked for the box, which Boria gave him. Palmer ordered Boria out of the car and to assume the position he had earlier assigned to Leuci. Palmer pat frisked Boria but found no weapon. He opened the box and found it full of shotgun shells except for a few that were missing. He placed the box on either the

hood or the front fender of Kierstead's cruiser and asked Boria to open the trunk of his car, which he did. Palmer shined his flashlight into the trunk but found nothing.

We digress to return to the junction of Central and Crescent streets. After pointing Kierstead in the direction of Boria's car, Barton walked up to Corridori, who was still seated in his car next to the stop sign. Barton identified himself as a police officer and asked Corridori for some identification. Corridori produced his driver's license, which disclosed that he lived in Worcester. Barton gave Corridori the Miranda warnings and asked him whether he knew the occupants of the Oldsmobile. Corridori said he did not. Barton then asked Corridori to walk with him over to the Oldsmobile, to which Corridori agreed. They arrived just after the search of the trunk, as Palmer, Leuci and Boria were clustered around the back of the car.

Barton asked Leuci and Boria if they knew Corridori. One of them hesitated, as if to speak. Corridori, of whom no question had been asked but who was staring at Leuci and Boria, shouted, "No." Neither Leuci nor Boria responded to Barton's question. Barton then noticed the box of shotgun shells sitting on the front of Kierstead's cruiser and asked where the box had come from. Upon being told by Palmer where the box had been found, Barton opened it and found four or five shells missing. He then proceeded around to the back of Boria's car, looked at all three men, and asked if any of them had a firearm identification card. There was no response.[6] Barton then proceeded to the front seat of the car, observed a blue denim jacket in the middle of the front seat which appeared to cover some lumpy object, lifted the jacket up, and discovered a pump action shotgun with four or five shells in it. Part of the stock had been sawed off, and the over-all length of the weapon was twenty-five inches. Corridori, Leuci and Boria were

---

[6] Corridori did in fact possess a firearm identification card which, at the request of his counsel, was marked in evidence under some limitation which is incomprehensible to us.

then formally arrested and given the Miranda warnings. Kierstead returned to the front seat of the car, lifted the jacket and discovered two knitted stocking caps with slits in them which could be used as eyeholes.

The crime of conspiracy is complete upon the formation of an agreement to do an unlawful act. *Commonwealth* v. *Benjamin,* 3 Mass. App. Ct. at 618, and cases cited in note 27. The guidelines for determining the existence of a conspiracy have been stated often and need not be repeated here. See, e.g., *Commonwealth* v. *Smith,* 163 Mass. 411, 417-418 (1895) ("A conspiracy may be proved by circumstantial evidence, and this is the usual mode of proving it, since it is not often that direct evidence can be had. The acts of different persons who are shown to have known each other, or to have been in communication with each other, directed toward the accomplishment of the same object . . . may be satisfactory proof of a conspiracy"); *Attorney Gen.* v. *Tufts,* 239 Mass. 458, 493, 494 (1921); *Commonwealth* v. *Beal,* 314 Mass. 210, 221, 223-224 (1943); *Commonwealth* v. *David,* 335 Mass. 686, 693 (1967); *Commonwealth* v. *Nelson,* 370 Mass. 192, 196 (1976). Contrast *Commonwealth* v. *Kellogg,* 7 Cush. 473, 477-478 (1851); *Commonwealth* v. *David,* 335 Mass. at 696; *Commonwealth* v. *Fancy,* 349 Mass. 196, 200-201 (1965). We think it so clear as not to require discussion that the evidence in this case was sufficient to warrant a rational jury in concluding beyond a reasonable doubt that Corridori, Leuci and Boria had all conspired with each other to rob Winston's Pharmacy. See *Commonwealth* v. *Ehrlich,* 308 Mass. 498, 500 (1941); *Commonwealth* v. *Nelson,* 370 Mass. at 201. It was immaterial that Boria had not been named as a coconspirator in either of the indictments against Corridori and Leuci. *Commonwealth* v. *Kiernan,* 348 Mass. 29, 55-56 (1964), cert. denied sub nom. *Gordon* v. *Massachusetts,* 380 U.S. 913 (1965).

2. Leuci (but not Corridori) filed a motion to suppress the shotgun, the shells and the masks as the fruits of an ille-

gal search and seizure.[7]  The evidence at the pretrial hearing was substantially the same as the evidence at trial, with certain significant additions which are material to the propriety of the ruling by which the judge denied the motion. First, Barton testified at the pretrial hearing that when Corridori pulled his car alongside Boria's car on Central Street, the two cars were less than a foot apart and that Corridori passed a dark, rigid object into the front seat of the Boria car.[8]  Next, Barton testified that when he first spoke to Corridori as the latter was seated in his car at the junction of Central and Crescent Streets, Corridori produced his driver's license but was unable to produce a registration for the car.  Palmer testified that when he observed the Remington box on the floor of the back seat of Boria's car, he asked Boria what was in the box; that Boria said the box was empty; but that when Boria handed the box to Palmer, he (Boria) said, "Oh, I guess there's something still in there."[9] Finally, it appeared that by the time Boria's car was searched, neither Kierstead nor Palmer had received any reply from the dispatcher in response to their requests for records checks on Leuci and Boria.

The conference of the three men in front of the Corridori car, the passing of an object from that car into the Boria car,

---

[7] As it will make no difference in the result, we pass the point that the docket numbers typed on the face of the motion did not include the docket number of the conspiracy indictment against Leuci. We also note that the Commonwealth no longer argues, as it did below, that Leuci lacked "standing" to question the legality of the search of Boria's car. See *Rakas* v. *Illinois*, 439 U.S. 128, 130, 140, 143, 148-150 (1978); *United States* v. *Salvucci*, 448 U.S. 83, 86, 91-92 (1980); *Rawlings* v. *Kentucky*, 448 U.S. 98, 104, 105-106 (1980).

[8] The prosecutor forgot to introduce this evidence before he rested at trial.

[9] This evidence was introduced at trial but was omitted from our earlier recitation because the judge limited the application of the evidence to· Leuci.  The judge appears to have operated on the mistaken premise that the declaration of one alleged coconspirator is inadmissible unless made in the presence of another alleged coconspirator.  See on this point *Commonwealth* v. *Beckett*, 373 Mass. 329, 335-341 (1977).

the parking of the latter car nose out and adjacent to the building housing the only place which was still open for business in the gathering dusk, and the parking of the Corridori car in such a position that its occupant could serve as a lookout or assist in a getaway were all specific and articulable facts which justified a stop of the Boria car and a threshold inquiry of its occupants. See G. L. c. 41, § 98; *Commonwealth* v. *Riggins,* 366 Mass. 81, 83-87 (1974); *Commonwealth* v. *Silva,* 366 Mass. 402, 405-406, 408 (1974); *Commonwealth* v. *Ling,* 370 Mass. 238, 240-241 (1976); *Commonwealth* v. *Almeida,* 373 Mass. 266, 271 (1977); *Commonwealth* v. *Moynihan,* 376 Mass. 468, 470-471, 471-472 (1978). Contrast *Commonwealth* v. *Bacon,* 381 Mass. 642 (1980). Leuci and Boria had given an improbable explanation of their presence and the position of the Boria car. Compare *Commonwealth* v. *Riggins,* 366 Mass. at 87-88. Neither Kierstead nor Palmer had yet received a reply from the police dispatcher which might have served to allay their suspicions. Compare *Commonwealth* v. *Almeida,* 373 Mass. at 272. Corridori had been unable to produce a registration for his car (compare *Commonwealth* v. *Almeida,* 373 Mass. at 272; *Commonwealth* v. *Stavros,* 4 Mass. App. Ct. 848, 849 [1976]; contrast *Commonwealth* v. *Ferrara,* 376 Mass. 502, 505 [1978]) and had lied when asked if he knew the occupants of the Boria car.[10] Palmer's action in shining his flashlight into that car was well within the scope of a threshold inquiry (*Commonwealth* v. *Cavanaugh,* 366 Mass. 277, 281-283 [1974]; *Commonwealth* v. *Ling,* 370 Mass. at 241-242), and the Remington box was discovered in plain view. *Commonwealth* v. *Silva,* 366 Mass. at 409-410. *Commonwealth* v. *Ling,* 370 Mass. at 241-242. The possession of ammunition is an indictable offence if the person in possession does not have either a firearm identification card or a license to carry

---

[10] Quite apart from the radio transmission by the police dispatcher, each of the officers is to be taken as possessing the knowledge of all the other officers. *Commonwealth* v. *Riggins,* 366 Mass. at 88.

firearms. G. L. c. 140, § 129C. G. L. c. 269, § 10(h). Boria had lied to Palmer when asked if there was anything in the box. Upon their discovery of the fact that four or five shells were missing from the box (if not before), the officers had probable cause to believe that a search of the car would net a loaded shotgun. See *Commonwealth* v. *Ling*, 370 Mass. at 239-240, 242; *Commonwealth* v. *Ortiz*, 376 Mass. 349, 354 (1978). Contrast *Commonwealth* v. *Silva*, 366 Mass. at 409-410.

The officers were faced with exigent circumstances which relieved them of the necessity of securing a search warrant. *Commonwealth* v. *Rand*, 363 Mass. 554, 560-561 (1973). *Commonwealth* v. *Antobenedetto*, 366 Mass. 51, 53-54 (1974). *Commonwealth* v. *Riggins*, 366 Mass. at 88. *Commonwealth* v. *Ling*, 370 Mass. at 239-240, 242. The District Court (located in Worcester) had long since closed. Kierstead and Palmer were the only two patrolmen on duty in the whole town, and their two cruisers were the only ones available. Dispatching one of those two officers to look for a magistrate and leaving the other and Barton to guard the car and detain all three men [11] (at least one of whom was subject to arrest for unlawful possession of ammunition) would have effectively stripped the entire town of police protection for an indeterminable period of time. See *Commonwealth* v. *Ortiz*, 376 Mass. at 356; *Commonwealth* v. *Huffman*, *ante* 185, 189-190 (1981). Contrast *Commonwealth* v. *Hall*, 366 Mass. 790, 801-804 (1975).

In the totality of the circumstances we conclude that the warrantless search of the Boria car was reasonable in the constitutional sense and that Leuci's motion to suppress was properly denied.

3. Both defendants duly objected to the questions put to Barton which were designed to bring out the facts (a) that Leuci and Boria had remained silent when asked if either of them knew Corridori and (b) that all three men had re-

---

[11] We do not know whether Barton, who was off duty and had come directly from his home, was armed.

mained silent when asked if any of them had a firearm iden-
tification card.  There were similar objections to a question
put to Kierstead which was designed to bring out the fact
that all three men had remained silent when Barton in-
quired as to the ownership of the shotgun that had been
found.  All the objections were overruled, and the answers
to the questions were admitted in evidence.

We pass the fact that Corridori had already been given
the Miranda warnings before he joined the group which was
clustered around the back of Boria's car (see *Common-
wealth* v. *Grieco*, 5 Mass. App. Ct. 350, 358 [1977]), and
we find it unnecessary to decide whether the questions to
the witnesses should have been excluded for the reason that
any conspiracy had already come to an end before the
underlying questions were put to the defendants.  See *Com-
monwealth* v. *White*, 370 Mass. 703, 708-710 (1976).  We
are more disturbed by the repeated violations of the rule of
evidence which excludes testimony as to the silence of one
who has been arrested or who has been detained by the
police for questioning.  See *Commonwealth* v. *Kenney*, 12
Met. 235, 237-238 (1847); *Commonwealth* v. *Brailey*, 134
Mass. 527, 530 (1883); *Commonwealth* v. *Freeman*, 352
Mass. 556, 559-560, 563 (1967); *Commonwealth* v. *Mor-
rison*, 1 Mass. App. Ct. 632, 634 (1973); *Commonwealth* v.
*Andujar*, 7 Mass. App. Ct. 777, 779-780 (1979); *Common-
wealth* v. *Rogers*, 8 Mass. App. Ct. 469, 473 (1979); Leach
& Liacos, Massachusetts Evidence 205 (4th ed. 1967).

By the time Barton put the first two questions, the
officers were already engaged in searching Boria's car but
had not progressed beyond its trunk.  It is obvious that
none of the three men would have been permitted to leave
before the officers had completed their search of the
car. See and compare *Commonwealth* v. *Cruz*, 373 Mass.
676, 679-680, 682, 683-684 (1977); *Commonwealth* v.
*Mosby*, *ante* 1, 7 n.3 (1980).  Contrast *Commonwealth* v.
*Meehan*, 377 Mass. 552, 557-559 (1979), cert. dismissed,
445 U.S. 39 (1980); *Commonwealth* v. *Best*, 381 Mass. 472,

491-495 (1980). By the time Barton put his questions as to the ownership of the shotgun, arrests of all three were a foregone conclusion, if not already accomplished. The judge had heard the answers to the first two questions in the course of the pretrial hearing on the motion to suppress and thus knew what to expect. He limited the application of the answer to the third question to Leuci, but he never instructed the jury on the significance of the limitation. He instructed in his charge that "[s]ilence is in the evidentiary picture in this case" and then proceeded to compound his errors with an inadequate and confusing exposition of the circumstances in which admissions by silence may be admissible in evidence in a conspiracy case. Compare *Commonwealth* v. *Freeman*, 352 Mass. at 561-563. Both defendants duly objected to the instructions, but the infection went without cure.

We find ourselves unable to conclude that the errors were harmless (compare *Commonwealth* v. *Cohen*, 6 Mass. App. Ct. 653, 657-658 [1978]; contrast *Commonwealth* v. *Grieco*, 5 Mass. App. Ct. at 358-359) because the jury may well have considered that the concerted silences of the defendants were significant factors pointing to the existence of a conspiracy. We also think it possible that the silences which followed the questions as to a firearm identification card and the ownership of the shotgun may have tainted the conviction of Leuci on the firearm indictment against him. Accordingly, we hold that there must be a new trial on all three indictments.

4. The other questions which have been argued are not likely to arise on a retrial, particularly if counsel take care to caution the witnesses not to characterize the conduct of the defendants and Boria as "suspicious."

The judgments on indictments nos. 89071, 89074 and 89076 are reversed, and the verdicts on those indictments are set aside.

*So ordered.*