COMMONWEALTH *vs.* DANNY ROGERS.

Suffolk.    September 7, 1979. — October 19, 1979.

Present: HALE, C.J., GRANT, & KASS, JJ.

*Evidence,* Admissions and confessions, Hearsay, Spontaneous utterance.

At a criminal trial, it was reversible error to admit in evidence portions of a tape recorded police interrogation of the defendant wherein the police had recounted to the defendant accusations made by a codefendant which were unequivocally denied by the defendant. [473-475]

At a criminal trial, the judge did not abuse his discretion in excluding as hearsay a witness's testimony as to her conversation with the victim some six hours after the crime had occurred. [475]

INDICTMENT found and returned in the Superior Court on February 17, 1977.

The case was tried before *Prince,* J.

*Robert A. Aronson* for the defendant.

*Michael J. Traft,* Assistant District Attorney, for the Commonwealth.

HALE, C.J. The defendant was tried for the murder of one Michael Sanders, robbery of a wallet from Sanders, and assault with intent to murder one Clarence Brown. He was convicted of assault with intent to murder but was acquitted of the charge of murder. The jury failed to reach a verdict on the robbery charge, and a mistrial was declared on that charge.

The Commonwealth's case against the defendant was based primarily on Brown's testimony. According to Brown, he was working at a theatre in Roxbury on the evening of February 3, 1977, as a disc jockey and clerk-typist. Sanders, his employer, was also present at the theatre that evening. Brown was working in a front office which, he testified, contained stereo equipment, projectors, films, a color television and a typewriter. The defendant and one Timothy Fluker[1] were present at the theatre with Brown and Sanders at approximately 10:00 P.M. One Carlton Bond arrived shortly afterward.

About 11:00 P.M. or midnight, Fluker and the defendant left the theatre to buy wine and beer from an after-hours liquor store. Bond left with them to catch a bus. Fluker and the defendant then returned with wine and beer. Sanders, Fluker and the defendant went to a back room, apparently to drink and view a movie. Although Brown's testimony was contradictory, there was testimony that the defendant came out from the back room and asked that the volume of the stereo equipment to which Brown was listening be turned up higher. After being told that Sanders would have to decide whether the stereo was to be turned up, the defendant returned to the back. Fluker came from the back room and turned up the volume. Brown saw Fluker and the defendant make three or four trips together to the men's room, located off an adjacent hallway.

---

[1] Fluker and the defendant were indicted together, but Fluker was tried separately after the defendant's motion to sever his trial from Fluker's was granted. Fluker was tried first, and his convictions of second degree murder and assault with intent to murder have been affirmed. *Commonwealth* v. *Fluker*, 377 Mass. 123 (1979).

Brown testified that either Fluker or the defendant (he wasn't sure which) returned to the front office and that Brown asked whoever it was to tell Sanders to come to the front to help him spell a word on a publicity release he was typing. That person then left. Shortly thereafter the defendant and Fluker came into the front office and told Brown that Sanders wanted to see him in back. Brown walked toward the back. He "felt" that the defendant and Fluker were behind him. Then "everything went out." Brown testified that he assumed the defendant and Fluker were behind him because they had made motions to follow him as he started out of the office.

There was also evidence that the next morning Brown was found covered with blood by Ricky Sanders, Michael Sanders's brother. He had been shot in the head, and a bullet was lodged behind his eye. The body of Michael Sanders was found in a rear office. A screwdriver and a discharged cartridge casing were found in the same room as the body; a wallet, a bankbook, and personal papers bearing the name Sanders were found on the floor of an adjacent room. Also on the premises was a metal cash box with an indentation near the lock. Various pieces of stereo equipment and a television set were in the theatre on the night of February 3; the equipment and television set were no longer there on the morning of February 4.

The Commonwealth introduced tapes of two police interrogations of the defendant which were conducted the night of his arrest and which were played to the jury. In the first tape the defendant says in part that he was present at the theatre with Fluker; that Fluker went into a back room with Sanders; that Sanders had asked him to leave because "he thought . . . we was going to try to rip him off or something"; that he (the defendant) left and then returned, staying in the front office with Brown, who told him that he could not go into the back to see Fluker and Sanders; that Brown then went into the back; and that Fluker later emerged from the back and left with the defendant.

After the defendant gave this account of the events of February 3 and 4, he was questioned further by the police:

Q: "Now, let me ask you something. I have been told that you shot Clarence [Brown] and that you had a gun in your hand."

A: "It's a lie."

Q: "That's a lie?"

A: "Right."

Q: "What if I told you that there was a struggle in the back room between Mike [Sanders] and Timothy [Fluker] — at least, that's what it was alleged by Timothy — and he was shot through the hand, and the second shot went off and struck Michael Sanders in the head, and he collapsed in that room? What if I further tell you that it's alleged that Timothy left the room, went to wash his hand, and in the meantime you went in and got ahold of the gun, and then you went back in the room with Clarence —that's the big room that you said you couldn't get into — and that a shot was heard, and Timothy turned around, saw Clarence collapsed and you with the gun in your hand?"

A: "I deny it. It's a lie."

Q: "You deny everything?"

A: "Right."

Q: "All those things that I just mentioned to you now are all a lie?"

A: "Right. As far as you saying, you say, well, suppose you would have told me that I went back there, and Timmy was coming, and I shot him and collapsed him while Timmy was coming, that was a lie."

Q: "That is all a lie?"

A: "Right."

The tape recorder was then turned off. There was more conversation between the police and the defendant about Fluker's accusations. The defendant was asked whether he was going to "hold the bag for this." The defendant said, "I will tell you the truth," and agreed to have a second interrogation recorded.

At the beginning of the second tape the defendant told the police that his "first story was a lie because [he was] not taking no weight." He then gave a more detailed account of the events that night. He added, among other things, that Sanders had asked him to appear in a pornographic movie and had asked him to audition for it; that Fluker told him that Sanders had propositioned him; that when Fluker and Sanders went into the back room it was Fluker who told the defendant to leave; that Fluker returned to the front office and, after Brown went into the back, turned up the volume of the music; that after Fluker returned to the back, the defendant heard "two bangs" that "sounded like big firecrackers"; that Fluker emerged from the back room wearing gloves and with blood visible on one of his hands; and that when he and Fluker left, Fluker, with some assistance from the defendant, took a television set, telling the defendant that Sanders had said that Fluker could borrow it.

The defendant made a timely objection to the introduction in evidence of that portion of the first tape containing the relation by the police of Fluker's accusations. He contends, among other things, that Fluker's statements which were unequivocally denied by him should have been excised from the tape before it was played to the jury. We agree.

At the outset we note that the defendant was under arrest when he was confronted with Fluker's accusations. He was under no obligation to respond. Had he remained silent the accusation would not have been admissible. *Commonwealth* v. *Kenney*, 12 Met. 235, 238 (1847). *Commonwealth* v. *Sheppard*, 313 Mass. 590, 600, cert. denied, 320 U.S. 213 (1943). *Commonwealth* v. *Morrison*, 1 Mass. App. Ct. 632, 634 (1973). Had he replied to the accusation equivocally, the conversation would have been admissible under the venerable rule stated in *Commonwealth* v. *McGrath*, 351 Mass. 534, 538 (1967): " 'When a defendant while under arrest is charged with a crime by an accusation made in his presence, and makes an equivocal reply

or one susceptible of being interpreted as an admission or one not likely to be made by an innocent man, the question or statement and the answer or comment are admissible.' *Commonwealth* v. *Madeiros*, 255 Mass. 304, 313 [1926]. *Commonwealth* v. *Hamel*, 264 Mass. 564, 569 [1928]. *Commonwealth* v. *Graham*, 279 Mass. 466, 468 [1932]. *Commonwealth* v. *Valcourt*, 333 Mass. 706, 716 [1956]. *Commonwealth* v. *Machado*, 339 Mass. 713, 715-716 [1959]. The answer is admitted as an admission and the accusatory statement is admitted to 'give meaning and effect' to the answer. See *Commonwealth* v. *Kenney*, 12 Met. 235, 237 [1847]; *Commonwealth* v. *Anderson*, 220 Mass. 142, 145 [1915]."

Here the defendant's response to the accusations was an unequivocal denial. Standing alone, that response could not have been regarded as an admission, and the accusations were nothing more than incompetent hearsay. *Commonwealth* v. *Twombly*, 319 Mass. 464, 465 (1946). *Commonwealth* v. *Pleasant*, 366 Mass. 100, 102 (1974). *Commonwealth* v. *Hosey*, 5 Mass. App. Ct. 138, 140-141 (1977).

In an effort to bring the accusation and the response within the rule stated in the *McGrath* case, the Commonwealth would find equivocation in the story told by the defendant on the second tape. The Commonwealth argues that the defendant's statements that his first story was a lie, that he had been present in the theatre at the time of the shooting, and that he had assisted Fluker in removing Sanders' television set amount to an equivocation of his earlier denial of Fluker's accusations. The same argument could be made concerning the statement "I will tell you the truth," made off the tape and after the accusations.

A reading of the transcript of the tapes indicates that there was no such equivocation. While it is true that the story the defendant told in the second interrogation differed from the story he told in the first, the defendant at no time retreated from his denial of Fluker's accusations.

The second story was an expanded version of the first account, consistent with it in many details. In the expanded version the defendant told the police that he had heard a sound "like loud firecrackers" from the back room where Fluker, Brown and Sanders had gone and that Fluker had emerged with blood on one of his hands. While he inculpated Fluker in the second story, he kept himself removed from the area where the shootings took place, and thus there was no equivocation of his denials. His statements that his first story was a lie and that he would now tell the truth did not refer to his denials of Fluker's hearsay accusations.

The accusations in the first tape could easily have been excised before the tape was played to the jury, and it was error not to have done so. If some sort of transitional language between the two statements was needed, a general statement to the jury that certain statements made by Fluker had been repeated to the defendant would have been a sufficient bridge between the two. Having examined the other evidence against the defendant, we cannot conclude that the defendant was not harmed by the admission of the accusations, and the judgment must be reversed.

The defendant has raised one other issue which may arise on retrial. At trial one Shirlene Jones testified that she had seen Brown at the theatre sometime between 9:00 and 9:30 A.M. on the morning of February 4. The defendant offered her testimony that Brown had said, "Somebody broke in here last night," and, "I don't want you to call a doctor." The witness's testimony was properly excluded as hearsay. The substance of her conversation with Brown was not relevant to impeach Brown's testimony. Nor does the conversation fit within the spontaneous utterance exception to the hearsay rule. The witness's conversation with Brown took place at least six hours after he had been assaulted. See *Rocco* v. *Boston-Leader, Inc.*, 340 Mass. 195, 196-197 (1960); *Commonwealth* v. *McLaughlin*, 364 Mass. 211, 221-223 (1973).

There was no abuse of discretion in excluding the proffered testimony. See *Commonwealth* v. *Hampton*, 351 Mass. 447, 449 (1966).

*Judgment reversed.*
*Verdict set aside.*