## COMMONWEALTH *vs.* ROBERT ROBINSON.

Essex.  May 13, 1987. — September 2, 1987.

Present: SMITH, CUTTER, & WARNER, JJ.

*Practice, Criminal,* Examination of jurors, Argument by prosecutor, Instructions to jury, Judicial discretion, Sentence. *Jury and Jurors. Evidence,* Relevancy and materiality.

The judge in a criminal case did not abuse his discretion in declining to ask prospective jurors, including one particular juror who was the wife of a part-time police officer and who later participated in the final deliberations, whether they would believe the testimony of a law enforcement officer rather than that of any other witness, where the defendant had shown no prejudice or significant risk that the case would be decided "on the basis of extraneous issues," and where, in any event, there was in the trial no contest of credibility between law enforcement officers and civilian witnesses. [683-684]

At the trial of a criminal case, the judge did not err, in the circumstances, in permitting the prosecutor's argument over the defendant's objection or in denying the defendant's motion for a mistrial on the basis of the argument, where appropriate corrective instructions were given to the jury at the outset of the judge's charge. [684-686]

At the trial of a criminal case, the judge did not abuse his discretion by giving a limiting instruction to the jury on certain evidence in his final charge rather than when first requested by the defendant at the close of a prosecution witness's direct testimony. [686-687]

At the sentencing of a defendant after his conviction by a jury on indictments for aggravated rape, breaking and entering with intent to commit a felony, armed robbery while masked, and assault and battery by means of a dangerous weapon, the judge did not err in imposing a consecutive sentence on the latter offense, to take effect at the termination of the concurrent sentences imposed on the other three indictments, where the indictment on the aggravated rape conviction specifically alleged that the sexual intercourse was "committed during the commission of an offense defined in G. L. c. 265, § 15A [assault and battery by means of a dangerous weapon], G. L. c. 265, § 17 [armed robbery], *or* [emphasis supplied] G. L. c. 266, § 17 [breaking and entering a building with intent to commit a felony]," and where the jury under proper instructions returned separate verdicts convicting the defendant of *each* of these three other offenses, only one of which was necessary to make the rape an aggravated rape under G. L. c. 265, § 22(*a*). [687-689]

INDICTMENTS found and returned in the Superior Court Department on September 12, 1984.

The cases were tried before *John L. Murphy, Jr.,* J.

*Maureen B. Brodoff,* Committee for Public Counsel Services, for the defendant.

*Judith Fabricant,* Assistant District Attorney, for the Commonwealth.

CUTTER, J. Robinson was indicted for aggravated rape, breaking and entering with intent to commit a felony, armed robbery while masked, and assault and battery by means of a dangerous weapon. After one mistrial, a second jury trial from January 27 to February 3, 1986, resulted in verdicts of guilty of all the charges. Robinson was sentenced to terms at M.C.I., Cedar Junction, more fully described below. See part 4 of the discussion in this opinion, and also note 6, *infra*. Robinson has appealed.

The victim, on Sunday, August 12, 1984, awoke about 6 A.M., in the bedroom of her first floor apartment in Lynn. A man wearing a nylon stocking over his head and holding a pair of open scissors in one hand was standing near the bed. He was wearing a T-shirt and his trousers "were dropped to his ankles." Using the scissors as a weapon at her throat, the man forced the victim to disrobe and to have repeated vaginal, oral, and anal intercourse with him. He then took from her the money in her possession, a gold chain, three rings, and a gold watch. After some insulting remarks, the intruder pushed her into a chair, picked up her legs and placed his finger in her vagina.

The intruder asked who else was in her apartment, into which the victim had moved four days earlier. The victim replied, "Just my daughter. Please don't hurt her." The intruder said, "Maybe I'll do her next."

Hearing that, the victim broke away from him, "ran into the hall and yelled upstairs" for Joseph Fleury, the landlord, who lived in the second floor apartment. The assailant started out the back door "and then came back . . . and grabbed his [the assailant's] vest, which was hanging on the bedroom door." He "came at" the victim "with the scissors." She put her hands

over her face and he stabbed her in the arm. Then he "ran out the back door." His mask and the scissors were found in the apartment.

The landlord, Fleury, and a cousin of the victim, who lived on the third floor, came to the victim's first floor apartment. The victim, her young daughter, and the cousin went to the cousin's apartment. The police were called and they soon arrived. The victim was taken to the Lynn Hospital and was examined there, and then went to the police station.

The victim never saw her assailant's face because of the stocking mask and the poor light. She described him as "of average height, fairly slender." He had brown hair and was white, in his "late teens or early twenties."[1]

There was other evidence (a) of conversations at the police station with Robinson, then seventeen years old, after Miranda warnings, in which Robinson described his activities on the night of August 11-12,[2] and (b) a fingerprint lifted by the police

[1] The assailant, according to the victim, was wearing a "black T-shirt with white lettering on it," blue jeans, "and a [leather] studded belt with an unusual belt buckle . . . . It was an American flag in some sort of an odd shape." He was also wearing jockey shorts. In the assailant's vest she had observed a package of Marlboro cigarettes. There was testimony from Karen Moreland (a friend of Robinson) that she had bought Robinson a package of this brand of cigarettes around midnight on August 11-12.

[2] From the testimony of various witnesses, especially (a) Detective Richard of the Lynn police (about a conversation with Robinson on August 13), and (b) Karen Moreland, it could have been found that Robinson on the evening of August 11, 1984, had been with some cousins at 33 Witt Street, Lynn. He had taken "three hits of THC" (tetrahydrocannabinol, "the primary intoxicant in marijuana," American Heritage Dictionary, 1257 [2d College ed. 1982], described by one witness as "a very powerful drug"). He had driven about Lynn with a friend consuming beer. Then he had gone to Karen Moreland's house at 263 Curwin Circle about midnight, where he smoked "[a]t least three joints" of marijuana with her. There he had remained until 5:30 A.M. when he had left, after some "kissing and hugging" of his hostess. He went to his home on Rogers Avenue by a route which led him not far from the victim's apartment. Robinson claimed to have arrived home about 6 A.M. When told by Detective Richard that Robinson's younger brother had stated that Robinson had arrived home about 7:30 A.M. On August 12, Robinson replied that he "couldn't recall because of the drugs he had taken," and that (after reaching Frank's Seagrille on his way home) "all of a sudden he drew a blank." Frank's Seagrille was at a point on his route home reasonably close to the victim's apartment.

in the victim's apartment on the day of the assault on the victim which could have been found on police testimony to have been Robinson's and to have been put there fairly recently.

Robinson turned over voluntarily to Detective Raymond Richard (see note 2) clothing and a belt which Robinson said he had worn on the night of August 11-12 and which also met the victim's description of the clothing and a belt worn by her assailant on the night of August 11-12. When told by a police officer that his thumbprint had been found on a screen in the victim's bedroom window, Robinson stated, "I can't say I did this and I can't say I didn't because of the drugs." Other testimony is stated in connection with discussion of the issues argued in behalf of Robinson.[3]

## Discussion

1. Robinson first contends that the trial judge improperly refused to put questions to prospective jurors who admitted some relationship to police officers and to others engaged in an occupation related to law enforcement. In particular, the judge declined to inquire whether the prospective jurors would "tend to believe the testimony of a police officer rather than that of a civilian witness if their testimony differed."[4] The judge denied a motion for an individual voir dire inquiry (see

---

[3] Robinson's trial counsel tried the case as if it involved misidentification of the intruder and as one in which young men other than Robinson might have had a motive to rape a former occupant of the victim's first floor apartment. The jury, however, were not required to believe the evidence brought out with this latter purpose. The jury obviously were not materially in doubt on the merits, for they took only one hour and twenty minutes (from 3:10 P.M. to 4:30 P.M.) on February 3, 1986, to reach their verdicts.

[4] The judge mentioned in one instance that he did not "ask that question," but he had already made inquiry of the particular juror, discovered that the juror was a school principal, accustomed to making decisions, and prepared to act only on the evidence heard in the court room. We do not view the judge's statement as not recognizing that he had discretion to ask the question.

The cases of *Commonwealth* v. *Ruiz,* 400 Mass. 214, 215-216 (1987), and *Commonwealth* v. *McFarland,* 15 Mass. App. Ct. 948, 949 (1983), do not require a trial judge to hear argument on every discretionary issue. It is enough if it is apparent that he knew he was acting on a discretionary matter. A judge (in the process of jury selection) does far better, however, to approach the problems of each case in a non-dogmatic fashion.

G. L. c. 234, § 28) of each prospective juror and put questions to the jury collectively. Two prospective jurors declared "indifferent" by the judge (although individually asked questions by him) were removed by peremptory challenges.

After Robinson had used all his peremptory challenges, the judge dealt with seating one juror whose husband's occupations were listed on the juror's questionnaire as (a) a guard for an armored truck company and as (b) a part-time police officer for a town. Defense counsel pointed this out at a bench conference. The judge denied a defense challenge of the juror for cause and noted Robinson's objection.

In the circumstances, the judge would have been prudent to have inquired more closely of all jurors who acknowledged having relatives engaged in law enforcement. In this instance, although the particular juror apparently participated in final deliberations, no showing was made of prejudice, other than defense counsel's general suggestion that the juror may have been subject to "some indurated bias that may have crept in over the years of . . . [the juror's] marriage." The present case involved no contest of credibility between law enforcement officers and civilian witnesses. See *Commonwealth* v. *McHugh*, 17 Mass. App. Ct. 1015, 1016 (1984). Robinson showed no significant risk that the case would be decided "on the basis of extraneous issues." See *Commonwealth* v. *Sheline*, 391 Mass. 279, 291 (1984). No abuse of discretion has been established. See *Commonwealth* v. *Szczuka*, 391 Mass. 666, 671-672 (1984); Smith, Criminal Practice and Procedure § 1709 (2d ed. 1983 & Supp. 1986). See also *Commonwealth* v. *Lapka*, 13 Mass. App. Ct. 24, 34-35 (1982).

2. Robinson contends that an aspect of the prosecutor's summation was unfair. Defense counsel had attempted during trial to establish that the police investigation in various respects had been inadequate, incompetent, or deficient. Defense counsel had (as Robinson's brief admits) "rehearsed these [alleged] deficiencies and asked the jury repeatedly to consider the deficiencies as they bore on reasonable doubt."

The prosecutor in his summation argued that the defense argument about police deficiencies was a "red herring" and

that jury consideration of the adequacy of the police investigation would distract them from the real issue in the case, which was whether Robinson committed the crimes charged. The prosecutor also told the jury that "there is nothing that we civilians like to do better than second-guess the police. But keep in mind we don't possess the tools [properly] to . . . do that any more than they possess the tools . . . [here defense counsel objected and the judge allowed the prosecutor to continue] to . . . second guess us as we perform our various jobs."

Robinson argues that this "demeaned a . . . legitimate defense strategy" and told the jury that they did not possess the means to appraise police deficiencies. The defense counsel's closing argument raised questions to which the prosecutor was entitled to make reasonable reply to offset impressions created by the defense closing. See and compare *Commonwealth* v. *DeJesus,* 17 Mass. App. Ct. 1020, 1021-1022 (1984). The prosecutor reasonably could have felt that undue and unfair emphasis had been placed upon the alleged police deficiencies. The judge, when objection was made to the prosecutor's argument, may have felt that the argument should not have been interrupted then and that the objection should (or could) be dealt with more appropriately at the close of the arguments and in his charge.

In any event, despite the fact that, in the pre-charge bench conference, defense counsel made (as to this part of the charge) only a request for a mistrial based upon all his objections during argument, the judge did give appropriate general corrective instructions at the outset of his charge. He pointed out that the jury "alone determine what the true facts are," that they do this "from a full and fair consideration of *all* the evidence presented in the courtroom" (emphasis supplied), and that they are the judges of the weight to be given to testimony and of the credibility of witnesses. The case seems to us to be more like *Commonwealth* v. *Gonzalez,* 22 Mass. App. Ct. 274, 282 (1986), than like *Commonwealth* v. *Kozec,* 399 Mass. 514, 522-526 (1987). See and compare *Commonwealth* v. *Simmons,* 20 Mass. App. Ct. 366, 370-372 (1985). There was no error in the denial of a mistrial or in permitting the prosecutor's

argument without more comment than was made in the general charge.

3. Robinson next argues that the judge erred in not giving limiting instructions concerning Detective Richard's testimony (see penultimate sentence of note 2, *supra*) about his conversation with Robinson's younger brother. There was objection by defense counsel followed by a bench conference just prior to the inquiry set out in the margin.[5]

At the time of his interrogation by Detective Richard on August 13, 1984, Robinson was not under arrest. Indeed, he was not arrested until a month later. Compare *Commonwealth v. Rogers,* 8 Mass. App. Ct. 469, 473-474 (1979),where the defendant was under arrest and made *unequivocal* denials in response to police inquiries. It may well have been apparent from Detective Richard's testimony that he was only restating to Robinson what he (Richard) had said to Robinson (so as to give meaning to Robinson's *equivocal* answer). In any event, no limiting instruction was requested at the bench conference which preceded the testimony under discussion (see note 5, *supra*) or immediately after Detective Richard's answer. Such a limiting instruction was first requested (after a luncheon recess) at the close of Detective Richard's direct testimony, when the general course of the testimony had turned to other matters. The judge told counsel to call the matter to his "attention at the close of the case." The requested limiting instruction was marked for identification. It was given in the judge's charge (after only one intervening further day of testimony) in essentially the same language counsel had requested.

---

[5] The inquiry proceeded as follows: "Q [by the prosecutor] What if anything did you say when . . . Robinson told you that he had gotten home at six o'clock? A [by Detective Richard] At that time, I stated to Mr. Robinson that I had been to his home on the 12th and I had conversation with a young boy there who stated that he was his brother and he stated that Robert was not home at this time and I inquired what time he had arrived home on Sunday morning. The boy stated to me that he arrived home at around seven-thirty A.M. Q What, if anything, did Mr. Robinson say when you told him that? A He stated that he couldn't recall because of the drugs he had taken. He stated that he had, that he does recall, that he had gone as far as down Holyoke Street, down to Myrtle to Frank's Seagrille, then all of sudden he drew a blank."

It might have been preferable for the judge to give the limiting instruction earlier in the case but that was a matter (affecting management of the trial) within his sound discretion. He did not abuse that discretion. See *Commonwealth* v. *Ferguson*, 365 Mass. 1, 11 (1974).

4. Robinson contends that there was error in sentencing him. He was sentenced to a term of fifteen to eighteen years for aggravated rape and to concurrent lesser terms for breaking and entering and for masked armed robbery. He was then given a consecutive sentence of three to five years for assault and battery by means of a dangerous weapon, to take effect at the termination of the prior concurrent sentences.[6] He now contends that the aggravated rape conviction under G. L. c. 265, § 22(*a*), as appearing in St. 1980, c. 459, § 6, might have been based on the assault and battery conviction (G. L. c. 265, § 15A). The indictment specifically alleged that the sexual intercourse was "committed during the commission of an offense defined in G. L. c. 265, § 15A [assault and battery by means of a dangerous weapon], G. L. c. 265, § 17 [armed robbery], *or* [emphasis supplied] G. L. c. 266, § 17 [breaking and entering a building with intent to commit a felony]."

The jury under proper instructions returned separate verdicts convicting Robinson of *each* of these three other offenses, only one of which was needed to make the rape an aggravated rape under the present § 22(*a*).[7] We think that the judge was not precluded from selecting one of the offenses (the assault and

---

[6] No change in these sentences was made by the Appellate Division of the Superior Court.

[7] The judge's initial instructions on this point mentioned serious bodily injury as an aggravating factor and listed only two of three possible applicable aggravating offenses: breaking and entering and masked armed robbery. At a bench conference after the charge, the prosecutor asked the judge to add assault and battery to the list of possible aggravating factors. Defense counsel asked the judge to eliminate "serious bodily injury" as an aggravating factor and, in effect, agreed that any of the three other offenses could be the basis for concluding that the rape was aggravated. Compare *Commonwealth* v. *Williams,* 23 Mass. App. Ct. 716, 718 (1987). The trial judge then, in supplemental instructions, said, "If you found there was a rape and you found that on *any* of the other indictments that the defendant is guilty, you may find aggravated rape" (emphasis supplied).

battery charge), and imposing a separate non-concurrent sentence on that offense, relying upon the verdicts of guilty on the other two offenses mentioned in the indictment and also in the present version of c. 265, § 22(*a*), as constituting an aggravation of the rape.

We thus are not forced to determine which of the other sentences was regarded by the jury as constituting the aggravation. See and compare *Commonwealth* v. *Williams,* 23 Mass. App. Ct. 716, 720-721 (1987), where only one statutory offense was charged in that indictment (which did not charge "serious bodily injury") as constituting an aggravation of the rape there considered. Cases involving sentencing for first degree murder which may be based on a jury finding of felony-murder (involving both murder and the felony which may cause it to be murder in the first degree) are distinguishable. Compare *Commonwealth* v. *Wilson,* 381 Mass. 90, 123-126 (1980), where only one underlying felony was charged which might have been the basis of the first degree murder conviction. Any concern about the general language of the *Wilson* case, at 124-125, we think is removed by *Commonwealth* v. *Pennellatore,* 392 Mass. 382, 390-391 (1984).

The separate verdicts on separate offenses in the present case perform essentially the same function which was provided by the jury answers to the special questions in the *Pennellatore* case.[8] The separate verdicts made it clear what aggravating violations had been found by the jury to have taken place. In the *Pennellatore* case (at 390), the court decided that, "[s]ince the jury found that two separate, sufficient grounds existed for their first degree murder finding in addition to the felony-murder ground," earlier decisions (precluding consecutive sentences) could be distinguished. The possibility had existed in the *Pennellatore* case that felony-murder was the *sole* basis for a jury verdict of murder in the first degree. When, however,

---

[8] The practice of putting special questions to juries considering charges of aggravated rape and, specifically, questions as to the reasons for finding such (if they do so find) aggravation, is to be commended. It may greatly simplify deciding whether there has been any improper duplication of sentences.

the causes for the first degree verdict were ascertained by the special questions (at 391), consecutive sentences could be imposed for offenses determined not to have been necessary to sustain the first degree murder verdict.

*Judgments affirmed.*